## COMMONWEALTH *vs.* CHARLES L. TUCKER.

Middlesex.    September 6, 7, 1905. — November 28, 1905.

Present: KNOWLTON, C. J., LATHROP, HAMMOND, LORING, & BRALEY, JJ.

*Practice, Criminal.   Jury and Jurors.   Homicide.   Evidence.   Witness. Words,* " Civil processes."

After the defendant in a criminal case has pleaded not guilty, it is within the discretion of the presiding judge or judges to decide whether he should be allowed to retract his plea and enter a special plea and a motion to quash the indictment, and a refusal to allow such retraction and pleading anew is not the subject of exception.

It is no ground for challenging for cause a juror in a trial for murder that the constable to whom the venire to summon him was sent for service had not given a bond to serve civil process, summoning a juror being a part of the process for the organization of the court and not within the meaning of the term "civil processes " as used in R. L. c. 25, § 88.

On a trial for murder, if the government proposes to show that at the time of the murder there was in the house where the murder was committed a certain amount of money consisting principally of bank bills, and that shortly after the murder this money was in the possession of the defendant, it is proper as one of the steps in this demonstration to admit, against the exception of the defendant, evidence that before the murder the defendant was short of money and after the murder had money in his possession, and if later in the trial the defendant contends that there is no evidence or insufficient evidence that money was stolen from the house where the murder was committed, he can ask at the close of the whole evidence to have the evidence as to the defendant's pecuniary condition before and after the murder excluded from the consideration of the jury.   If he does not do this, his original exception cannot be sustained, because the evidence as to the defendant's pecuniary condition was admitted properly at the time it was offered as a part of what the government proposed to prove, and the order in which such evidence shall be admitted is a matter within the discretion of the court.

In a trial for murder there were admitted in evidence, against the exception of the defendant, broken pieces of a knife which were found in a coat pocket of the defendant by officers sent to search the house in which the defendant lived with his mother.   It appeared that the officers had a search warrant which authorized them to search for a graphophone and which the defendant contended was not taken out in good faith, but it also appeared that this warrant was not served and nothing was done under it, that the officers went with it to the house in question and stated to the defendant's mother that they had this warrant to search for the article named in it, that the defendant's mother declined to take or examine the warrant, and invited the officers to make all the search they desired, saying that she knew her son to be innocent, that thereupon the officers made search and found the pieces of the knife.   The defendant contended that the search was an abuse of legal process, also that he did not consent to the search and that his mother could not consent for him.   *Held,* that it was

unnecessary to consider the question whether the pieces of the knife should be excluded as evidence because obtained by abuse of legal process, as the officers in making the search did not proceed under the search warrant but under the invitation of the defendant's mother, and that the consent of the defendant was immaterial, for, even if the officers were trespassers in relation to the defendant and liable to him for the trespass, the pieces of the knife found in the pocket of the defendant's coat were none the less admissible in evidence.

In a trial for murder, upon the question whether an address written on a paper, which shortly after the murder was found in the house where the murder was committed, was in the handwriting of the defendant, the government offered as standards of comparison certain " sales slips" alleged to be in the handwriting of the defendant. It was shown that the defendant was employed as a salesman, and that whenever he sold anything it was his duty to make a memorandum of the article sold and of its price together with his name or initials upon one of the sales slips furnished for the purpose, and that many of the slips offered in evidence, all of which had the defendant's name written upon them, were delivered to the shipping clerk by the defendant in person. The presiding judges, against the defendant's exception, made a preliminary finding that the sales slips were in the handwriting of the defendant, and ruled that they were competent as standards of comparison but that the jury finally were to determine whether the slips were in the handwriting of the defendant. *Held,* that the preliminary finding was justified and the ruling was correct; that, even if the handing in by the defendant of such a memorandum with his own name upon it would not justify a finding, in the absence of evidence to the contrary, that the defendant admitted the writing to be his, a standard of comparison for handwriting can be established by circumstantial evidence, and here such evidence amply justified a finding that the slips were in the handwriting of the defendant. *Held, also,* that the judges, in passing upon the question of the authenticity of the proposed standards in the first instance and submitting any question of fact to the jury for final determination, followed the uniform and long continued practice in this Commonwealth; that the ruling was correct; and *semble* that, if it had been erroneous, the defendant could not have been harmed by it, as it was in his favor and gave him another chance of having the evidence excluded by the submission of the question to the jury.

It is within the discretion of the presiding judge or judges in a criminal trial to refuse to allow the defendant to cross-examine an expert in handwriting, called as a witness by the government, as to certain mistakes which he has made in testifying in other cases, and it also is within their discretion to permit such a witness to use certain photographs as " chalks."

In a trial for the murder of a woman it is within the discretion of the presiding judges to admit a photograph of the corsets worn by the deceased at the time of her death and appearing to have been cut by a knife, after a preliminary finding that the corsets were substantially in the same condition when the photograph was taken as at the time of the murder, and the photograph thus may be admitted in evidence, although the corsets themselves are in court, for the purpose of showing the condition of the corsets when the photograph was taken nearly six months before the trial.

The statement of facts permitted to be assumed in the framing of a hypothetical question to an expert is largely within the discretion of the presiding judge, and ordinarily is not a subject for exception.

In a trial for murder it is proper to permit an expert in surgery called as a witness by the government to use in illustration of his testimony a photograph of the

pieces of a broken knife blade put together, although the original pieces already are in evidence.

In a trial for murder, upon the question whether a certain vein of the deceased was severed by a stab in the back, after a medical expert called by the defendant has testified that it is highly improbable and seems impossible that the vein was cut as contended by the government and that he has made experiments for the purpose of "ascertaining that opinion," no exception lies to a refusal of the presiding judges to allow the defendant to ask the witness what experiments he has made.

If in a trial for murder a witness for the defendant testifies that he saw the defendant go by his house on the day of the murder at a certain hour, and the government attempts to impeach the credibility of the witness by showing on his cross-examination that he had made previous statements inconsistent with his testimony on this point, this gives the defendant no right to introduce evidence of statements of the witness consistent with those made at the trial in corroboration of his testimony, and the exclusion of such corroborative evidence gives the defendant no ground for exception.

A photograper, called by the government as a witness in a trial for murder, who has made an enlarged photograph from an original negative and has testified that he cannot say whether a certain pin shown to him is or is not that which appears in the photograph, cannot be asked by the defendant which of two pins in his opinion is the one represented in the enlarged photograph, both pins and the photograph being before the jury, and it not appearing that the witness can see better than the jury which pin is shown in the photograph.

Certain instructions in regard to the burden of proof and the defence of an alibi, given by two justices of the Superior Court sitting in a trial for murder, held to have been in substance the instructions which the defendant requested on those subjects, and declared to be clear and accurate statements of the law.

The law does not set any minimum limit to the time of deliberation and premeditation required to make a malicious homicide murder in the first degree within the meaning of R. L. c. 207, § 1. The deliberation and premeditation followed by the resolution to kill and the killing all may occur within a few seconds.

In a charge to the jury in a trial for murder there is no error in the use of the following illustration of the deliberate premeditation required to make a malicious homicide murder in the first degree: "A robber with a dirk or pistol turns a corner and meets a bank messenger with a roll of bills. In a moment he determines to get it; the next moment he shoots or stabs the messenger dead, takes the package and flees. His malice was deliberately premeditated, though it occupied only a few seconds."

While the taking of notes of the testimony by a juror in a trial for murder as in other cases may not be commendable it is not illegal and as matter of law does not require the setting aside of a verdict.

If the presiding judges in a trial for murder, in which a juror has taken notes of the testimony and the defendant has been found guilty, find on a motion for a new trial that the taking of the notes in no way worked to the prejudice of the defendant and that no injustice to him has resulted from this circumstance, and the evidence justifies their conclusions, their refusal in the exercise of their judicial discretion to set aside the verdict will not be disturbed.

INDICTMENT charging Charles L. Tucker with the murder of Mabel Page at Weston on March 31, 1904.

In the Superior Court the case was tried before *Sherman* and *Sheldon*, JJ. Before the jury were empanelled the counsel for the defendant read a special plea, a motion to quash, and a motion to withdraw the defendant's plea of not guilty and to substitute therefor the special plea and motion to quash. These motions were denied by the judges.

The jury returned a verdict of guilty of murder in the first degree; and the defendant alleged exceptions, raising the questions stated by the court.

The fourth, fifteenth, sixteenth and seventeenth instructions requested by the defendant, mentioned in paragraph 15 of the opinion, related to the burden of proof and to the defence of an alibi.

The following extracts from the charge to the jury, which was delivered by *Sheldon*, J., are held to have given in substance the instructions requested on these subjects, and are approved by the court:

"You are not to convict upon suspicion, upon a bare probability or a mere weighing of probabilities, or even upon a mere preponderance of the evidence against him. If the facts proved can be fairly reconciled with any reasonable theory of the prisoner's innocence, he must be discharged.

"The proof of his guilt must be beyond a reasonable doubt, or he is entitled to a verdict of not guilty. It must be proved with this degree of certainty that the crime was committed, that the life of the deceased was unlawfully taken by this prisoner, or he must be acquitted. If this is so shown, still the burden remains upon the Commonwealth to prove that the crime committed was murder, or else he can be convicted only of manslaughter. And if it is shown that he committed the crime of murder, still the burden remains upon the Commonwealth to prove, beyond a reasonable doubt, that this was murder in the first degree, or else your verdict can be only guilty of murder in the second degree."

"But, of course, where as here only circumstantial evidence is offered, it is necessary that each fact necessary to the conclusion sought to be established must be proven by competent evidence beyond a reasonable doubt, and all the facts necessary to such conclusion must be consistent with each other and with the main

fact sought to be proved; and the circumstances taken together must be of a conclusive nature, leading on the whole to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and not some other person committed the offence charged. The mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, and all of them together weak and inconclusive, will not justify a conviction; though it must be remembered, gentlemen, that many independent circumstances gain additional force by their number, just as a cable is stronger than any of the strands of which it is made up taken separately. The circumstances must be such as to generate and to justify full belief according to the standard rule of certainty, that is, beyond a reasonable doubt. It is not sufficient that they coincide with and render probable the guilt of the prisoner. They must exclude every other reasonable hypothesis. No other conclusion than that of the guilt of the accused must fairly and reasonably grow out of the evidence. The facts must exclude innocence; must be incapable of explanation upon any other reasonable hypothesis than that of guilt.

"In order to convict the defendant upon circumstantial evidence it is necessary not only that all the circumstances concur to show that he committed the crime charged, but that they are inconsistent with any other reasonable conclusion. I mean, of course, all the proved circumstances. It is not sufficient that the circumstances proven coincide with, account for, and render probable the hypothesis sought to be established by the prosecution, unless they also exclude to a moral certainty, that is, beyond a reasonable doubt, every other hypothesis than the single one of guilt. If this is not so, the prisoner is entitled to a verdict of not guilty."

"Now, gentlemen, there are some of the circumstances in dispute here to which your attention ought to be called a little more in detail. The first and most important of these is whether or not the prisoner was in the Page house at the time of the commission of this murder. If he was not there, or if upon all the evidence you are left in reasonable doubt whether he was there, then of course he must be acquitted."

"The claim of the Commonwealth is that he might well have

been there, that it was amply possible for him to have been there, and that all the facts and circumstances show that it was his hand, with his knife, that dealt the fatal blows; that he carried from that house upon his knife and his clothing stains of the blood of his victim; that he stole money from her pocketbook, and a pin from her cushion; that he left behind him, whether by accident or for the purpose of averting suspicion from himself, evidence of his guilty presence at the murder in the shape of an address written by himself; that he had upon his person both the sheath, which in little over an hour afterwards fell from his pocket by an accident, and the knife itself, which he denied having and sought to mutilate and to destroy as evidence against himself; that he attempted, when called upon for an explanation, to exculpate himself by false and lying stories.

" On the other hand, it is claimed by the prisoner that he was not on that day in the Page house at all, or nearer to it than Cutter's Corner; and all the circumstances claimed to incriminate him which I have mentioned are denied, or claimed to have been fully accounted for by him. And he also denies that any of the circumstances which have been alleged against him, or all of them that have been proved, are sufficient to warrant the reasonable inference of his guilt.

" The first question, then, to be considered is, Was he, could he have been, present at the time and place of this murder? . . . for just as if he was not present at the time and place of the murder his innocence is demonstrated, [so, also, if it is shown with the requisite certainty by other convincing circumstances that he did commit this crime, then it necessarily follows that he must have been present when it was committed; and accordingly all the other circumstances which bear upon his guilt or innocence must be considered in this connection.] *

" And so you will consider whether you ought to say that this murder may have been committed by some tramp, or by some one who had knowledge of this household and of the presence or absence of its members at this time. But here, as in the case of every other essential fact, the burden is upon the Commonwealth to satisfy you beyond a reasonable doubt that this pris-

---

* The words in brackets were in. the charge, but were not quoted in the bill of exceptions.

oner was present at the time and place of the homicide; and if the Commonwealth has not so proved this, if you are left in reasonable doubt upon it, you will go no further, but will return a verdict of not guilty."

The portion of the charge relating to the definition of "deliberately premeditated malice aforethought" is quoted in the opinion.

*J. H. Vahey & T. F. Vahey*, (*P. Mansfield* with them,) for the defendant.

*H. Parker*, Attorney General, (*G. A. Sanderson*, District Attorney, *& F. B. Greenhalge*, Assistant Attorney General, with him,) for the Commonwealth.

HAMMOND, J.    1. We have not found it necessary to consider whether the indictment should have been quashed for the reasons set forth in the special plea and the motion to quash, because we are of opinion that that question is not before us for decision. The defendant having entered a plea of not guilty was not entitled as a matter of right to retract his plea and plead anew. He could do this only by the permission of the court, (1 Chitty, Crim. Law, 436, *Commonwealth* v. *Blake*, 12 Allen, 188, *Commonwealth* v. *Lannan*, 13 Allen, 563,) and whether that permission should be granted rested with the sound discretion of that court. Acting under that discretion the court declined to allow the defendant to retract his general plea, overruled the motion, and therefore, because not filed in time, the plea. No error in law is shown by this decision. It was final and cannot be revised by this court.

2. The only objection to Hubbard, who was summoned as a juryman, was that the constable to whom the venire was sent for service had not given a bond to serve civil process. This was not ground for a challenge for cause.

The statutes provide that "the venires shall be delivered to the sheriff of the county to be transmitted by him to a constable in each of the cities and towns to which they are respectively issued, who shall forthwith serve them in cities on the board authorized to draw jurors and in towns on the selectmen and town clerk." R. L. c. 176, § 11. After the jurors are drawn, "the constable shall, four days at least before the time when the jurors are required to attend, summon each person who is

drawn, . . . and shall make a return of the venire with his doings thereon to the clerk of the court, before the sitting of the court by which it was issued." § 24. It is plain that this is not a service of a writ or an execution in an action between two persons, but is simply a part of the process for the organization of the court. It is special and specific, and we are of opinion that the term "civil processes" as used in R. L. c. 25, § 88, does not include this specific work. The challenge for cause was rightly disallowed.

3. In the course of his opening address to the jury the district attorney stated that "the family of the deceased searched the house after the murder, and only thirty-six cents were found in one pocketbook downstairs in the bureau; that when Amy Roberts, a servant in the family of the deceased, went away in the morning, there was at least a ten dollar bill and two ones, and other money in the deceased's pocketbook downstairs." He then proceeded as follows: "The rest of it [money] had disappeared. It also appears that shortly before this time this defendant was trying to raise money to go to St. Louis; that he sold a revolver, . . . several suits of clothes, that he pawned a watch — " Here he was interrupted by the defendant's counsel who contended that any such evidence would be incompetent and therefore it was improper for the district attorney to speak to the jury about it, even in the opening. Thereupon a colloquy ensued between the court, the district attorney and the defendant's counsel, in which the defendant's counsel conceded that it was "competent for them [the government] to show that money was missing from the house and to argue, if it is possible, that the defendant had that money"; but his contention was that it was not proper to attempt to show that "the defendant was hard up, or that he was attempting to go to St. Louis, or anything which indicated his poverty"; that such evidence does not establish any motive as matter of law. In response to an inquiry from the court he further said that if the intention of the district attorney was to show that the defendant was without money before the murder, but that afterwards he had money, he would not object. The district attorney then said that he intended to go as far as that. The counsel for the defendant still insisted that the district attorney ought to say

" what he intends to prove," and that in the absence of any such further statement the opening remarks referred to were improper.

At the end of the colloquy the court allowed the district attorney to finish what he had to say on the subject, " with the understanding that the court has not ruled on it yet, and it will. be ruled on when the whole statement is made," and said that the court understood that the defendant had seasonably interrupted to save his rights. The subject was not again referred to by the defendant's counsel, and no further request for a ruling thereon was made. The district attorney then continued as follows : " It will appear also, gentlemen of the jury, that within a few days after the murder he appeared at a certain place and displayed money, a part of which was a ten dollar bill ; that he then explained the loss of other money by saying that it had been taken from him by a woman whom he had met at a theatre and afterwards went to a hotel with." During the trial the Commonwealth offered evidence in support of this statement of the district attorney, and the court directed the jury to disregard entirely so much of the evidence as related to the defendant's statement that money had been taken from him by a woman.

Following out the purpose thus outlined in the opening, the Commonwealth introduced evidence tending to show that upon various occasions within ten days before the murder the defendant sold or pawned various articles of personal property, mostly wearing apparel of small value, receiving in all $17.50 in cash ; that on April 8, being a few days after the murder, he redeemed for $5.75 two of the articles pawned before the murder. To the admission of all this evidence the defendant excepted.

One Davis, a witness called by the Commonwealth, after having testified without objection that on the sixth day of the same April the defendant was in a restaurant where the witness was working, and said that he had needed some money and had pawned some things a short time before, further testified subject to the exception of the defendant that the defendant upon the same occasion said that " he had been out on a good time and lost some money; that he had pawned some . . . to raise money " ; that in paying for his dinner he handed the witness a

ten dollar bill " brown on one side," and that at the same time the witness saw in defendant's possession " a five and a two and some other bills."

There was no contention that the articles pawned and sold were not the defendant's property. It also appeared, upon the cross-examination of one of the witnesses called by the Commonwealth, that on the sixth day of the same April the defendant pawned his own diamond ring, receiving therefor $15.

It is argued by the defendant that before the law the rich and the poor stand alike, and that the poverty of the defendant is not admissible to show a motive in him to commit the crime with which he is charged. All this may be conceded to be true. As stated by Bigelow, C. J. in *Commonwealth* v. *Jeffries*, 7 Allen, 548, 565, 566, " It is doubtless true that in a large class of cases the poverty or pecuniary embarrassments of a party accused of crime cannot be shown as substantive evidence of his guilt. The reason for the exclusion of such evidence is, that in those cases there is no certain or known connection between the facts offered to be proved and the conclusion which is sought to be established by it. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish. It does not follow because a man is destitute that he will steal, or that when embarrassed with debt and incapable of meeting his engagements he will commit forgery." Mere poverty considered apart from all other facts tending to connect the accused with a crime never can tend to show criminal intent or criminal motive.

Upon this record, however, it is perfectly clear that the evidence, the substance of which we have recited, was offered and admitted upon an entirely different ground, namely, to show that at the time of the murder there was in the house in which the murder was committed a certain amount of money consisting mostly of bank bills, and that shortly after the murder this money was in the possession of the defendant, or, to use the language of the defendant's counsel, " to show that money was missing from the house and to argue, if it is possible, that the defendant had that money." Such evidence unexplained would tend to show that the defendant was in the house at the time of

the murder. It was not necessary that the bills should be identified by ear marks. *Commonwealth* v. *O'Neil*, 169 Mass. 394. One of the steps in such a process might be to show that before the murder the defendant was short of money and after the murder he was not short, that is, to show a marked change in the amount of money in his possession. This the Commonwealth undertook to do, and all the evidence which was admitted upon this branch of the case, including the defendant's statements as to his lack of money, his losses, his financial transactions both before and after the murder and his possession of money was admissible upon this step. It is true that all this evidence did not tend to connect the defendant with the crime with which he was charged unless there was evidence tending to show that at the time of the murder money was taken from the house. The court were assured by the district attorney that he expected to show that such was the fact. Evidence must go in by piece-meal, and evidence having a tendency to prove a proposition is not inadmissible simply because it does not wholly prove the proposition. It is enough if in connection with other evidence it helps a little. The Commonwealth in this part of its case sought to prove two things, namely, that after the murder the defendant had more money than before, and that he got some of it from the house. Subject to the direction of the court the prosecuting officer could begin with either proposition he might see fit, and it was within the discretion of the court to permit him to introduce the evidence tending to prove the first before passing to the evidence tending to prove the second. Relying upon his assurance as to his ability to prove the second, the court permitted him to put in the evidence tending to prove the first.

It is argued by the defendant that so far as appears from the bill of exceptions there was no evidence whatever tending to prove the second proposition, namely, that any money was missing from the house; but we do not so interpret the bill of exceptions. Near the end of the bill is the statement that it presents all the testimony material to the questions raised by the bill, and that "no question was made but that there was evidence for the jury on all the issues submitted to them." In the charge to the jury the court said: "The claim of the Com-

monwealth is that he [the defendant] might well have been there . . . ; that he carried from that house upon his knife and his clothing stains of the blood of his victim; that he stole money from her pocketbook. . . . On the other hand, it is claimed by the prisoner that he was not on that day in the Page house at all, . . . and all the circumstances claimed to incriminate him which I have mentioned are denied or claimed to have been fully accounted for by him." It thus appears that one of the issues submitted to the jury was " whether he stole money from her pocketbook," and the fair interpretation of the bill is that on that issue there was evidence in support of the claim of the Commonwealth.

But whether or not there was such evidence is not material to the inquiry before us. Even if there was no such evidence upon the second proposition, or if it was insufficient, the most that can be said is that the evidence introduced to prove the first became thereby immaterial; and if, at the close of the whole evidence, the defendant had requested the court to exclude from the consideration of the jury the portion relating to the first, upon the ground that there was no sufficient evidence of the second, and the court had refused to grant the request, there would have been error. But no such action was taken, the defendant preferring apparently to stand upon his original exceptions. It is further suggested that at the time the district attorney made his opening he had no reason to suppose that he could show that money had been taken from the house, but there is nothing to show that the statement was not made in good faith, and the trial court at any rate committed no error in law in relying upon it. We are of opinion that no error was committed in the action of the court with reference to the opening of the district attorney, or in the admission of the evidence.

4. It was contended by the defendant that the broken pieces of knife found in his coat pocket were not admissible. The exception to their admission was taken in various forms, but in substance the ground of the exception was that the pieces were obtained by an abuse of legal process and their admission therefore was an infringement of his constitutional rights, especially those under the fourth, fifth and fourteenth amendments to the

Federal Constitution, and the twelfth and fourteenth articles of the State Declaration of Rights. The question of the manner in which the articles were obtained was tried before the court in the absence of the jury at the request of the defendant. The evidence is given in great detail in the bill of exceptions. The finding of the court is as follows: " The court finds that one of the purposes of taking out the search warrant alluded to was to search for evidence to be used in this case against the prisoner if there should subsequently be a trial, but that this was not the sole purpose, and that the warrant was taken out in good faith, under an honest belief that the facts stated in the complaint were true, and that one purpose was to search for the article therein mentioned, but that no service was made of this warrant, and that nothing was actually done under it; that officers went with it to the door of the house where Tucker resided, and stated to his mother, at the outside door of the house, that they had this search warrant to search for the article named therein and offered to let her examine the warrant; that she declined to take it or examine it, and invited the officers to make all the search they desired, saying that she knew her son to be innocent; and thereupon the officers made search, not upon the warrant, but in consequence of her invitation, and in such search found the articles in question; that the warrant bears a return that no service thereof has been made, which we find to be the fact. The court is also of opinion, if this is material and competent, that if the prisoner's mother had not invited the officers to make the search, they would still have made it under and by virtue of said warrant."

It is strongly argued by the defendant that this finding is not warranted by the evidence, and that the court should have found that so far as respected the graphophone, the only article named in the warrant, the warrant was not taken out in good faith; and that in entering the house and in searching therein the officers acted solely under their warrant, without any invitation or consent on the part of the defendant's mother. We have carefully examined the evidence bearing upon this matter, and are of opinion that it fully justifies the finding of the court. It also is to be noted in this connection that while the court in the first instance had to pass upon these facts, still it recog-

nized that the defendant had the right also to the decision of the jury upon them, but the defendant did not desire to go to the jury upon them.

We think therefore that the finding that neither in entering the house nor in making the search did the officers proceed under the search warrant, but in consequence of and under the invitation of the mother, must stand. It is therefore unnecessary to consider the argument of the defendant which is based upon the assumption that the articles were obtained by an abuse of legal process.

It is further argued that the defendant did not consent and that his mother could not consent for him. But that is immaterial. The officers did not act under the warrant but under the invitation of the mother, and even if, not acting under the warrant, they were trespassers as against the defendant, still this was no abuse of legal process, but simply an individual trespass, and that is not sufficient to exclude the evidence. They might have been liable for the trespass, but the evidence thereby obtained was nevertheless admissible. *Commonwealth* v. *Tibbetts,* 157 Mass. 519. *Commonwealth* v. *Hurley,* 158 Mass. 159. *Commonwealth* v. *Byrnes,* 158 Mass. 172. *Commonwealth* v. *Brelsford,* 161 Mass. 61. *Commonwealth* v. *Acton,* 165 Mass. 11. *Commonwealth* v. *Smith,* 166 Mass. 370.

5. Upon the question whether the written address " J. L. Morton, Charlestown, Mass.," which was found in the Page house shortly after the murder, was in the handwriting of the defendant, the Commonwealth offered as standards for comparison certain " sales slips " which it contended were in the handwriting of the defendant. The defendant objected to the use of these slips as standards. As to the authenticity of these standards the Commonwealth made an offer of proof, and to expedite the trial it was agreed by both parties that " all statements of fact [therein] included . . . together with the offered statements of witnesses therein referred to were to be considered and taken as facts established by evidence," the " defendant contending that such facts were not competent to render the sales slips . . . admissible as standards of the defendant's handwriting." Upon hearing the offer of proof " the court ruled as a preliminary matter that the agreed statement of facts con-

tained in the . . . offer of proof made the sales slips competent as standards of comparison, but that the jury were to determine from the agreed statement of facts whether such slips were in the handwriting of the defendant." The defendant excepted. We understand the action of the court to be a finding by the court as a preliminary question of fact that upon the agreed statement of facts contained in the offer the slips were in the handwriting of the defendant and might be used as standards, but that the question whether they were in the defendant's handwriting should be finally left to the jury.

The first objection of the defendant to this action is that the facts contained in the offer were not sufficient to justify the use of the slips as standards. The defendant contends that the handwriting of a standard must be proved by direct evidence of the signature, " or by some equivalent evidence," and that the only way in which this can be done is either by the testimony of the witness who saw the defendant write it or by the defendant's admission that he wrote it. Even if the defendant's contention were correct as to the method of proof, we are of opinion that upon the facts contained in the offer the trial court properly may have found that the defendant had admitted the signature upon some of the slips at least to be his. The facts show that it was his duty as salesman, in the instance of every sale, to make a memorandum of the articles sold, their kind and price, (using blank forms called sales slips furnished for that purpose,) together with his name or initials, and to transmit these slips so filled out to a shipping clerk. Many of the slips were delivered to the shipping clerk by the defendant in person. All had upon them the name of " Tucker." As to those which were handed in personally by the defendant, the court well might have found that by that act unexplained the defendant admitted them to be his own handwriting. It was his duty to make them out as memoranda of his work, and to hand them in as such, and the handing in of such a memorandum with his own name upon it would justify a finding, in the absence of any evidence to the contrary, that he admitted the writing to be his. *Commonwealth* v. *Coe,* 115 Mass. 481.

But we do not rest upon this narrow ground, for we are of opinion that the defendant's contention as to the method of

proof is not correct. There is a considerable diversity in the
various courts as to the use of standards of handwriting and the
degree and kind of proof required to establish a piece of writing
as a standard. See 15 Am. & Eng. Encyc. of Law, (2d ed.)
252 *et seq.*, for a collection of the authorities. But whatever
may be the rule elsewhere, it has been said by this court that
here the standard shall be proved by "direct proof of the signa-
ture or other equivalent evidence," and we understand that to
be the true statement of our rule. *Commonwealth* v. *Eastman*,
1 Cush. 189. *Martin* v. *Maguire*, 7 Gray, 177. *Bacon* v. *Wil-
liams*, 13 Gray, 525. An examination of the cases in which this
language is used will show, however, that the distinction declared
is between evidence based solely upon an inspection of the paper,
as for instance that given by an expert or one acquainted with
the handwriting of the party charged, and who testifies as to the
genuineness solely by comparison with another standard or with
an exemplar in his own mind, on the one hand, and on the other
hand evidence of a different kind having a tendency independent
of any opinion as to handwriting to show that the paper was
written by the party charged. In other words, you cannot prove
a standard by the opinion of witnesses as to the handwriting of
the person charged, whether the opinion be based upon compar-
ison with other writings or upon a knowledge of the party's
handwriting obtained in any other way. The evidence to prove
the standard must be entirely independent of opinion as to hand-
writing. The first kind of evidence is not sufficient, but the
second may be, even if it contain no statement of a witness who
saw the standard written, or any admission by the party charged.
There is no reason why evidence which, independent of any
opinion upon the handwriting as such, justifies a finding beyond
a reasonable doubt that the proposed standard was written by
the defendant, should not be regarded as the equivalent of evi-
dence given by a witness who testifies that he saw the paper
written. And that is so even if the evidence of the genuine-
ness of the writing be partially or even wholly circumstantial.
Indeed it is only commonplace to remark that circumstantial evi-
dence is frequently more satisfactory than direct. By reason of
mistake, bias or dishonesty the testimony of a witness that he
saw the standard written may be utterly unreliable, while a

compacted mass of circumstantial evidence, the existence of each circumstance being satisfactorily proved and the proof of each being confirmed by the proof of the other, and all without an exception leading by mutual support to but one conclusion, may be impregnable. In the case before us the facts contained in the offer of proof were sufficient to warrant a finding beyond a reasonable doubt that the sales slips were written by the defendant, and if the writing of these slips had been a crime and the defendant had been on trial for it, they amply would have justified his conviction of the offence. To say that such evidence is not the equivalent of the evidence of a witness who testifies that he saw the standard written is to fly in the face of common experience and to ignore the basis upon which rest the leading principles of our system of evidence. The court made no error in admitting these slips as standards.

6. The court, having admitted the slips as standards, in its closing charge submitted to the jury the question whether they were written by the defendant, instructing them that "unless the Commonwealth shows by strong, undoubted proof, that is, by proof beyond a reasonable doubt, that the writing upon these slips was actually made by the defendant, — and if [the jury] do not so find, — they are not to be used at all and the jury should wholly disregard them and all the great body of evidence which they have heard about them." No exception was taken by the defendant to these instructions, but it is objected by him that the decision of the court that the slips were written by the defendant was final and that the submission of that question to the jury was error. In support of this position the defendant has cited some authorities from other jurisdictions which seem to support his contention ; but here, as in other branches of the law as to the admission, proof and use of standards, there is much conflict in the authorities, (see for instance *Rowell* v. *Fuller*, 59 Vt. 688, *State* v. *Hastings*, 53 N. H. 452, 460,) and it would serve no useful purpose to review them here.

The law with reference to the decision of preliminary questions concerning the admissibility of evidence, especially in criminal cases, has been quite recently considered by this court in *Commonwealth* v. *Reagan*, 175 Mass. 335, and we need only to refer to that case and the cases therein cited to show what

the practice is in this State.  The practice as to confessions is thus stated by Morton, C. J., in *Commonwealth* v. *Preece*, 140 Mass. 276 : " When a confession is offered in evidence, the question whether it is voluntary is to be decided primarily by the presiding justice.  If he is satisfied that it is voluntary, it is admissible; otherwise, it should be excluded.  When there is conflicting testimony, the humane practice in this Commonwealth is for the judge, if he decides that it is .admissible, to instruct the jury that they may consider all the evidence, and that they should exclude the confession, if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant." In *Commonwealth* v. *Reagan, ubi supra,* the same doctrine was said to be applicable to the question of the competency of a witness to understand the nature of an oath. In these and similar questions the defendant has the right to the decision of the court upon the admissibility of the evidence, and if the decision involves a finding of fact he has a right to such finding.  But if in a criminal case the decision is against the defendant, he has another chance before the jury, so far as it depends upon a question of fact.  In passing upon the question of the authenticity of the proposed standards in the first instance, and then submitting any question of fact involved for the final determination of the jury, the court followed the uniform and long continued practice of this Commonwealth.

In addition to the authorities cited from other jurisdictions, the defendant, in support of his contention that the decision of the court is final in the sense that it cannot be submitted afterward to the jury, cites *Commonwealth* v. *Coe*, 115 Mass. 481, 505, *Costelo* v. *Crowell*, 139 Mass. 588, 590.  But it is manifest that in each of those cases where the court say or imply that the decision of the court is final unless error in law is shown, the meaning simply is that it is final so far as respects the power of this court to revise it on questions of fact, and the language has no reference to the powers or rights of the jury.  In *Commonwealth* v. *Coe*, Wells, J. uses the following language, which not only shows the sense in which the decision of the court is said to be final, but also hints at the practice of considering the decision of the court as only preliminary : " Upon the question whether a given writing or written word is sufficiently proved

to have been written by the defendant to allow it to be sub-
mitted to the jury as a standard of comparison, the judge at the
trial must pass in the first instance. So far as his decision is of
a question of fact merely, it must be final, if there is any proper
evidence to support it. As in all questions of that nature, ex-
ceptions to the ruling at the trial will be sustained only when
they show clearly that there was some erroneous application of
the principles of law to the facts of the case, or that the evidence
was admitted without proper proof of the qualifications requisite
for its competency." In other words, the finding of the trial
court so far as respects facts cannot be revised by this court
provided the finding is justified by the evidence. These cases
adjudicate nothing as to the power or duty of the trial court,
after admitting the evidence, to submit the question to the jury
under proper instructions. In dismissing this branch of the
case, it may be remarked that even if the court's decision was
final in the sense urged by the defendant, it is difficult to see
how the defendant in this case could be harmed by having an-
other chance given to him by the submission of the question to
the jury.

7. The exception to the refusal of the court to allow the de-
fendant to interrogate Carvalho, an expert in handwriting called'
as a witness by the government, as to certain mistakes which he
had made in testifying in other cases, as well as the exception
to the action of the court in permitting the same witnesses to use
certain photographs as "chalks," must be overruled. These were
matters within the discretion of the court. This is too clear to
require further comment or the citation of authorities. No error
therefore appears in these rulings.

8. It does not appear distinctly that the defendant took any
exception to the admission of the addresses upon the postal card
taken from the clothing of the defendant at the time of his
arrest. The bill of exceptions recites only that "they were
introduced in evidence subject to the defendant's objection."
As both parties, however, have argued the question upon the
assumption that the defendant did except, we have assumed
that the word "objection" inadvertently appears instead of
"exception." The Commonwealth contends that the written
words "Morton & Co." and "Charlestown," which there was

testimony to show were written by the defendant, were competent because of the inferences to be drawn from the close resemblance of the name and address to that which appeared upon the writing found near the body of the deceased and alleged to have been written shortly after the murder had been committed, and may have had a tendency to establish a connection through an association of ideas between the defendant and the J. L. Morton address. The bearing of the evidence, it is true, is very slight, but its weight was for the jury. We cannot say that its admission was erroneous.

9. As to the admission of the photograph of the corsets of the deceased, worn at the time of her death and appearing to have been cut by a knife, it is sufficient to say that so far as respects the questions whether the corsets were in the same condition at the time the photograph was taken as at the time of the murder, with the exception of the change naturally arising from handling, and whether such change would have any substantial or material effect upon the use of the photograph as evidence, were in the first instance for the court. *Blair* v. *Pelham*, 118 Mass. 420. The evidence justified a finding for the Commonwealth upon both of these questions, and the court having admitted the photograph it is to be taken that it so found. And it was within the discretion of the court to admit the photograph to show the condition of the corsets at the time the photographs were taken, although at the time of the trial, which was nearly six months later, the corsets themselves were in court. The photograph was a representation of a part of the history of the condition of the corsets from the time of the murder to the time of the trial, and may have been of assistance to the jury in the consideration of questions relating to the substance and fabric of the material of which such corsets were made and of the possibility of changes therein where the cut was made, as well as for the purpose of comparing the photograph with the corsets as the jury saw them.

10. There is nothing in the exception to the hypothetical question put to the witness Harris, an expert in surgery called by the government. " Where expert testimony is offered by way of answers to hypothetical questions, much must be left to the discretion of the presiding judge. The jury are instructed

to disregard the answers unless they find the facts as assumed in the questions; but as it cannot be known in advance what may be the ultimate decision of the jury as to the facts in dispute, the usual practice is to allow counsel in framing a hypothetical question to assume the existence of such facts and conditions as the jury may have a right to find upon the evidence as it then is, or as there may be fair reason to suppose it may thereafter appear to be; and in determining whether a hypothetical question shall be allowed, the judge in many cases must rely to a great extent upon the good faith of counsel in their statements as to what they expect the evidence will be." *Anderson* v. *Albertstamm*, 176 Mass. 87, 91. Under this rule of practice the question was properly admitted.

11. The exception to the use by Dr. Harris of a photograph of the pieces of the broken knife blade put together is untenable. The sole objection of the defendant was that the original pieces were already in evidence, but this did not prevent the use of the photograph as a " chalk." It might be so used just as the witness in illustration of his testimony might have drawn upon a blackboard a sketch of the pieces if in the opinion of the court such an illustration might be of assistance to the jury.

12. One of the questions claimed at the trial of the defendant to be material was whether the azygos vein of the victim was severed by the stab in the back, the Commonwealth contending that it was and the defendant contending to the contrary; and, as is usual upon such occasions, the expert witnesses divided on that question, each taking the view favorable to the side by which he was called. Dr. Pease, a medical expert called by the defendant, on direct examination testified at first in substance that while it was barely possible that the vein was thus severed yet it was highly improbable, and finally said that to him it seemed impossible. He then was asked whether he had made any experiments for the purpose of " ascertaining that opinion," and in reply he said that he had. To this question and answer no objection was made. The defendant then asked him what experiments he had made. Upon objection by the Commonwealth this question was excluded and the defendant excepted. The following question was then put to him by the defendant: " Let me ask you, in order to make the matter clear, whether or

not you have made experiments upon a body, a human body, approximating the size of the body of the victim in this case as described to you?" To which he answered "I have." Whereupon the attorney general objected because it was immaterial whether he had or not, to which the defendant's counsel replied: "I am simply trying, in order to save whatever rights we have, to make the facts conform as closely as they can to this case. I am not intending to ask him any further, I understand your Honors having ruled it out." The attorney general then said: "Well, it was ruled out, as I understood your Honors, because the experiment is absolutely immaterial and uninstructive, and therefore whether he has or has not made an experiment is incompetent and immaterial," and then the court ordered the evidence stricken out.

We have stated this matter in detail because the defendant has argued that the witness was not allowed to testify that he had made an experiment upon a dead body approximating in size to that of the deceased. But he was allowed without exception to show that he had made experiments, and it was only when he undertook to define the nature of the experiment in some detail that he was stopped. We understand the ruling of the court to be in substance that he could not show the nature of the experiment, not that he could not show that he had experimented. Whether the details of an experiment not otherwise material may be shown as having some bearing as substantive evidence upon a question on trial depends upon the nature of the question and that of the experiment. If, for instance, the question be with reference to the operation, chemical or otherwise, of some natural force which acts uniformly under any given conditions, and the conditions under which the experiment is made are shown to be so similar to those which existed in the case on trial that the court can see that the experiment may be really of assistance to the jury, the details of the experiment may be put in as independent evidence. The true ground of admitting the details and result of such an experiment is that it may be of assistance, but the question whether it may be or whether it may or may not lead to too many collateral questions is largely within the discretion of the court. It is manifest that in view of the nature of the question in dispute, namely, whether

the azygos vein was cut by the stab in the back, taken in connection with the difference necessarily existing between the conditions in the case on trial and those under which the experiment was performed and the obvious difficulty, if not impossibility, of ascertaining whether such difference had any material effect upon the result, the court was fully justified in excluding the experiment or any inquiry into its nature. It is argued however that inasmuch as an expert has the right to explain the reasons for his opinion, it was competent for the witness to state this experiment in detail, to fortify his opinion. But it is settled in this Commonwealth that the rule allowing an expert to give the reasons for his opinion has its limitations, and one of them is thus stated by W. Allen, J:, in *Hunt* v. *Boston*, 152 Mass. 168, " A party cannot put in evidence incompetent facts under the guise of fortifying the opinion of his witness, even if the evidence might have been properly admitted on cross-examination to test the opinion of the expert." Accordingly it was held in that case that an expert witness on the value of land could not include in the statement of his reasons his knowledge of certain sales in the neighborhood, the sales not being such as were competent evidence of the value of the petitioner's land. The experiment being incompetent as substantive evidence, the court properly excluded all evidence as to its nature, even whether made upon a dead or a living body, although offered under the guise of a reason for the opinion of the witness.

13. One Doyle, called by the defendant, testified that he saw the defendant pass his (the witness's) house between 12.15 P. M. and 12.30 P. M. on the day of the murder. On cross-examination he was questioned at considerable length as to whether he had not made previous statements inconsistent with this statement. The defendant then offered to show by a re-examination of this witness and afterwards by one Hammond, called by the defendant, that the witness about ten days after the murder told Hammond that he saw " the defendant . . . passing by his [the witness's] house, on March 31, 1904, between quarter past and half past twelve, and that he (Doyle) said that he was sure it was " the defendant. This evidence was offered to show that the testimony of the witness Doyle as to this occurrence was " not a matter of recent contrivance." The evidence was

excluded, and it is strongly argued by the defendant that, the credibility of the witness having been attacked upon the cross-examination, the evidence should have been admitted for the purpose for which it was offered.

In the books there always has been a difference of opinion as to the admissibility of previous statements to corroborate a witness. In *Craig* v. *Craig*, 5 Rawle, 91, 97, there is an instructive opinion by Gibson, C. J. on this subject, in which some of the leading authorities are mentioned, and the question is briefly but forcibly discussed. In our own State the leading case on this subject is *Commonwealth* v. *Jenkins*, 10 Gray, 485. In that case Graham, a witness called by the Commonwealth, had previously testified in the same case in the police court. The defendant attempted to show by cross-examination of this and other witnesses that Graham in testifying in the police court gave a different account of the transaction from that given by him at this trial. The attorney of the Commonwealth then, for the purpose of confirming and corroborating the testimony of Graham at this trial, was allowed to introduce evidence that Graham on another occasion, when not under oath and when the defendant was not present, before the examination in the police court, gave substantially the same account of the transaction as that given by him at this trial. It was held that this was error, and that the testimony should have been excluded. In the opinion it was said by Bigelow, J.: " The purpose of the government in offering these statements was to corroborate the testimony of the accomplice, which the defendant had sought to invalidate and discredit by proof that on the preliminary examination before the police court the witness had given a different account of his interviews and dealings with the defendant from that to which he had testified before the jury. Although there is some contrariety of opinion in the books on the question of the competency of such evidence, it seems to us that on principle it ought to be excluded. It has no legitimate or logical tendency to establish the corroboration for which it is offered. How did the case stand on the evidence of the accomplice, when the government offered the statements objected to? He had testified in behalf of the government to an account of his dealings with the defendant concerning the

stolen property. The counsel for the defendant then called witnesses to show that at a previous time he had given under oath a different account of this same transaction. This evidence was offered, not for the purpose of proving the truth of such previous statements, but to show that he was unworthy of belief, inasmuch as he had given two inconsistent accounts of the same transaction, one of which was necessarily untrue. . . . It did not relieve the difficulty, or in any way corroborate the last story told by the witness, to show that previously he had made similar statements of the transaction. The discredit arising from the fact that he had made contradictory statements remained untouched. The contradiction was not disproved by such evidence, and this was all that the prior statements were offered to establish. . . . Such a corroboration is altogether too slight and remote." After proceeding further to show why the general rule should be adopted, the opinion goes on to say that the decision in the case " is not to be understood as conflicting with a class of cases, in which a witness is sought to be impeached, by cross-examination or by independent evidence, tending to show that at the time of giving his evidence he is under a strong bias or in such a situation as to put him under a moral duress to testify in a particular way. In such case, it is competent to rebut this ground of impeachment and to support the credit of the witnesses by showing that, when he was under no such bias, or when he was free from any influence or pressure, he made statements similar to those which he has given at the trial. Another similar class of decisions . . . is also to be distinguished from the case at bar, namely, when an attempt is made to impeach the credit of a witness by showing that he formerly withheld or concealed the facts to which he has now testified. In such cases, it is competent to show that the witness, at an early day, . . . did declare the facts to which he has testified." It was held that the case was not within either of these exceptions, and accordingly that the evidence was. improperly admitted.

At the time the evidence in the case at bar was excluded, there had been no attempt to impeach the credit of Doyle except by his cross-examination, and it therefore becomes necessary to examine that to see if there was any other impeachment of his

credit than that which necessarily and ordinarily would arise from the fact that he had made contradictory statements. In his cross-examination he stated that at the office of the attorney general, in the presence of a stenographer and several other persons whose faces he could not recall, he had made a statement of the case; that he had testified before the grand jury; that he could not tell how many times since then he had talked over the fact of the defendant's passing his house; that he had talked the matter over with one Ducey, an officer who was assisting in the preparation of the defence; that ever since he had talked with the State officers about the case he had expected to testify; that he intended to tell the truth before the grand jury and also at the office of the attorney general in Boston, and that, so far as he remembered, his present testimony was in accordance with that given by him before the grand jury; that he remembered that before the grand jury he was asked whether he saw the defendant on the day of the murder; that he replied in the affirmative and said that he saw him two different times, "once between half past one and quarter to two," at the Metropolitan boat house, in company with one Bourne, and next at three o'clock; that he did not remember that he was asked whether he had seen the defendant at any time "except that once and with Bourne," but he would not say he was not asked that question; that he did not know whether he then said that he "couldn't say for sure" whether he saw him go down past his (the witness's) house; that he would not say he did not say that; and that he would not say whether he did not say that he could not tell whether the defendant went by the house or not. And finally this question was put to him: "Now didn't you say in my office and to other people that you couldn't tell who the man was that passed your house, that you couldn't describe his dress, that you couldn't tell whether he had a beard or not, and you couldn't tell which way he was going? Haven't you said all those things before you came on to the stand here to-day?" To this question he said in substance that he did not know, would not say whether he had or had not.

The first question is whether in this examination it appeared that the witness ever had made any statements inconsistent with

his then present testimony about seeing the defendant going by the witness's house. As to his testimony before the grand jury he said that while testifying there he intended to tell the truth and that so far as he could recall his testimony there it was the same as here. So far there is no evidence of contradiction. Upon being further pressed he finally said that he did not know whether he there said " I can't say for sure whether I saw him [the defendant] go down past our house," although he would not say that he did not then say so ; that he did not remember that he said it. Here, too, there is no direct contradiction of his present testimony. If, however, it be assumed that when a witness upon being asked whether he formerly made a certain statement replies that he does not know whether he did or not, but that he will not say he did not, this may be an admission by implication that he did say it, or that upon such evidence it may be legitimately inferred that he did say it, still we have at the utmost here evidence that before the grand jury the witness said that he could not say for sure whether he saw the defendant go past his house on the day of the murder. This was a simple contradictory statement at the most. The same remarks may be made about the effect of the answer of the witness to the general question above quoted in full, with reference to whether the witness had not said in the attorney general's office and to other people that he could not tell who the man was who passed his house, nor which way he was going, nor how he was dressed. If the answers of the witness that he did not know but would not swear whether he had or not are to be regarded as sufficient to warrant the inference that he had made such statements, still here, as in the matter of his testimony before the grand jury, the statements are simply contradictory of his testimony at the trial ; and within the doctrine laid down in *Commonwealth* v. *Jenkins*, 10 Gray, 485, they do not justify the admission of the evidence offered by the defendant.

It is argued however that the situation was such as to bring the offer within the exception to this general rule, namely, when an attempt is made to impeach the credit of a witness by showing that he formerly withheld or concealed facts to which he has now testified, or in other words where it may be contended

that the testimony of the witness is a matter of recent contrivance. In a certain sense it is always true that every previous statement of a witness inconsistent with the one made by him at a trial has or may have a tendency to show that the latter is a matter of recent contrivance. It is certainly a recent statement and may be recently contrived. If the exception to the rule is to be so broad as to permit in every such case the introduction of previous consistent statements to prop up the credibility of the witness, the exception would very soon abolish the general rule. The general rule is founded upon sound policy. The corroborative evidence, even when admitted, can have, at most, only a very indirect bearing upon the credibility of the witness, while from its very nature it may be likely to influence the jury as substantive evidence of its own truthfulness. And since the danger that the evidence will have such an illegitimate influence is so great, it is important that the general rule should be adhered to unless the case appears clearly within the exception.

It is to be noted that this is not a case in which the Commonwealth attempted to impeach the credit of the witness by showing that he formerly withheld or concealed the fact that he had seen the defendant pass his house. The position of the Commonwealth was that he had made contradictory statements about that, and the admissions of the witness, (if admissions they may be called,) were simply to that effect. It was not a case where he had failed in former statements to speak on the subject, but where in speaking on the subject he had made previous statements inconsistent with his testimony at the trial. In other words, it was a simple case of contradictory statements, and so far was within the general rule. Nor do we think that the admission of the witness that he had talked with the officer who assisted in the preparation of the case is sufficient to bring the case within the other exception arising out of a claim of strong bias or sort of moral duress stated in *Commonwealth* v. *Jenkins, ubi supra.*

We think that these two exceptions, which were recently considered in *Griffin* v. *Boston*, 188 Mass. 475, should be construed with some strictness, so as not to nullify the general rule. Sometimes it will appear, from the nature of the evidence and

the course of the cross-examinations, that the cross-examining counsel intends to argue against the truth of the testimony because the witness is not shown to have spoken previously of the matter, when, if it were true, he would have been likely to speak of it.   To meet such a contemplated argument, it may well be proved that he did speak of it.   Or something of recent occurrence may appear, which would be likely to create a strong bias in the mind of the witness, and to put him under a kind of moral duress to testify as he does.

To answer the argument from such a fact, it may be shown that he said the same thing before the occurrence.   The admissibility of the testimony depends upon the previous introduction of such facts and the existence of such conditions.   Whether the course of the trial has been such as to require a statement of what the witness had previously said, to meet an attack upon his testimony, founded on either of these peculiar conditions, is primarily a question of fact, to be decided by the presiding judge.   His decision upon such a question ought not to be set aside by an appellate court unless it is plainly wrong.   To use a common expression, the reason for which has just been stated, the admission or exclusion of such testimony rests largely in the discretion of the trial court.

The court had the right to infer from the cross-examination that this was the ordinary case of an attempt to impeach the credibility of a witness by showing that he had made previous statements inconsistent with his then present testimony, and that the general rule existing in this Commonwealth should be applied.   In applying the rule under this interpretation of the cross-examination, the court committed no error.

It is contended by the defendant that the attorney general in his closing argument went further, and made remarks inconsistent with this view of the cross-examination, but it does not appear that he pressed the argument against the witness to any greater extent than is allowable in the ordinary case of inconsistent statements of a witness.   And in any event this could not affect the view which at the time of the offer of the evidence the court rightfully might take of the cross-examination.

14. The question to Thode, the photographer who had made

the enlarged photograph, was rightly excluded.* The witness already had testified that he could not say whether the pin shown to him was or was not that which appeared in the photograph. It is sufficient to say that, both pins and the enlarged photograph being all before the jury, it does not appear that the witness could see any better than the jury which pin was shown in the photograph. It was not a matter for expert testimony.

15. So far as respects the refusal of the court to give the fourth, fifteenth, sixteenth and seventeenth instructions requested, we have examined the charge with special reference to the subject matter of these requests, and are of opinion that while the court did not give the rulings in the language requested, still it gave them in substance, and with great clearness and accuracy stated the principles of law applicable thereto.† The court committed no error in the manner in which it dealt with these requests.

16. Upon the subject of deliberately premeditated malice aforethought, much was said in the charge. Very clearly and very emphatically the jury were told that in order to convict the defendant of murder in the first degree they must find beyond a reasonable doubt not only that he committed the homicide, but that he did it with deliberately premeditated malice aforethought. The court then proceeds as follows:

" The words 'deliberately premeditated malice aforethought' mean, simply, thought upon, resolved upon beforehand, not a thing done suddenly, not a thing that comes into the mind of a sudden and is done before there is time to think about it, but a thing thought of, or planned some time before, or if not planned some time before, yet thought upon long enough before the act is done so that it can reasonably be said to have become a purpose of the mind. No particular length of time is necessary. If it is thought upon reasonably beforehand, that is enough to warrant you in finding the crime to be murder in the first degree. Accordingly the chief justice of the highest court in our State said in one case, in language which I adopt and

---

* The question asked the witness by the defendant and excluded by the court was which of two pins in his opinion was the one represented in the enlarged photograph which he had made from the original negative.

† See ante, pp. 460–463.

give to you, ' To premeditate is simply to meditate beforehand. It need not be for a long time. It merely requires time to form a clear intent. For example, a robber with a dirk or pistol turns a corner and meets a bank messenger with a roll of bills. In a moment he determines to get it; the next moment he shoots or stabs the messenger dead, takes the package and flees. His malice was deliberately premeditated, though it occupied only a few seconds; for it was a cool act of the will, and is unlike the intent stimulated by a sudden act of quarrel, where one kills another suddenly, not having intended violence beforehand.'

" And to apply that principle, gentlemen, to this case, if you should find it shown with the requisite degree of certainty that this prisoner went to the Page house for the purpose of stealing something, or with any other unlawful purpose, but carried with him a deadly weapon for the purpose of taking human life if that should be necessary to make his escape or to remove a witness to his guilt, or to carry out his unlawful purpose, and if you should find that he did take the life of Mabel Page in pursuance of that purpose thus existing in his mind when he started upon the execution of his first or principal purpose, then, gentlemen, you would be warranted in saying that he committed the crime with deliberately premeditated malice aforethought, and that it was shown that he had been guilty of murder in the first degree.

"To constitute deliberate premeditation, you see, there must be a design, or plan, actually formed and resolved upon before the act, and the murder must be committed pursuant to the design or plan which has been thus formed. And it must be shown that the murder was the result of a design or plan formed after the prisoner had thus made it the subject of deliberation or reflection, although, in view of the quickness with which the mind may act, this deliberation, or reflection, may have been measured by seconds, only by an appreciable interval. The act must have been deliberately thought upon, resolved upon, beforehand, long enough before the act was done to warrant the inference that it was so thought upon and resolved.

" If accordingly, having first found that the prisoner is guilty of the crime of murder, you shall further find· that he committed the murder with deliberately premeditated malice aforethought, then he is guilty of the crime of murder in the first degree, and

you will say so by your verdict; if you do not find this further fact to be proved beyond a reasonable doubt, then your verdict will be only guilty of murder in the second degree."

After the case had been submitted to the jury, the court, in reply to requests from them for more light, further instructed them as follows: " Answering your question, gentlemen, exactly as you put it, deliberately premeditated malice aforethought cannot take place instantly with the act, if by that is meant that the two come exactly together. To constitute deliberately premeditated malice aforethought the purpose must have been formed so that you can say that it did distinctly precede the act. It makes no difference whether the interval between them was long or short, if it can be said that the purpose did distinctly precede the act, so that it became a fixed purpose of the mind, and was then executed by the act in pursuance of that purpose.

" As in the illustration which you will remember that I gave to you, — a robber with a dirk or a pistol turns a corner. He has no intention of committing crime when he turns the corner, but as he turns the corner he meets a bank messenger with a bundle of bills; a few seconds would suffice, perhaps one second would suffice, for the messenger to pass him in safety; but the minute that his eye lights upon that messenger with the roll of bills which the messenger is carrying, he conceives the purpose of robbery, and of taking the life of the messenger to obtain that money. He shoots or stabs the messenger to the heart, seizes the money and flees. That was deliberately premeditated malice aforethought although scarcely an appreciable interval of time separated the formation of the purpose from its execution. But it was deliberately premeditated malice, although the time was so brief because of the quickness with which the mind can work, and because the purpose was formed, was resolved upon, became a fixed purpose, before it was executed. It was the subject of resolution, of deliberation, although the resolution, the deliberation, were instantaneous — almost at any rate instantaneous — yet there was a real interval between them, because the act done in pursuance of the purpose could not have been carried into execution, could not have become an act, had it not been that the purpose was first formed; for that is the way in which I have stated the supposition.

" And so in this case if this prisoner did unlawfully take the life of this woman with malice aforethought, and if he did so in pursuance of a plan, a purpose, a resolution which he formed to do so — if, for example, to make a supposition, he saw or thought he saw that to make his escape to avoid the danger of an accusation of crime against him he must put her out of the way, and if he made up his mind — if he formed the purpose, the resolution — to put her out of the way for his protection, and in pursuance of that resolution, of that deliberate purpose, formed with a resolution and with deliberation, although quickly formed, he executed that purpose and wrongfully took her life, you would be warranted in saying that it was done with deliberately premeditated malice aforethought, even though the fatal blows followed at once after the determination to inflict them — immediately after the formation of the purpose, — provided, gentlemen — and I pray you to follow every word that I say — provided the purpose was distinctly formed and concluded upon, provided the plan was formed before it was acted upon, so that you could fairly say that it became a distinct resolution of the mind, a distinct purpose formed upon reflection, though upon the speediest reflection — formed upon deliberation, though upon the speediest deliberation.  If those things, gentlemen, are found, deliberately premeditated malice aforethought is properly to be inferred.  If those things are not found, although you shall have found that malice aforethought existed, you would not say that deliberately premeditated malice aforethought was to be properly found."

The defendant excepted " to that portion of the court's definition of murder in the first degree above recited " ; also to the definition of the phrase " deliberately premeditated malice aforethought," and especially to that part of the charge in which the illustration as to the bank messenger is given.

The phrase first appears in St. 1858, c. 154.  Before the passage of that statute the common law definition of murder was the one in force in this Commonwealth.  Murder at common law was murder here.  In the charge of Shaw, C. J. in *Commonwealth* v. *Webster*, 5 Cush. 295, the trial of which took place in 1850, will be found a very clear exposition of this crime.  There was only one degree, and it was punishable with death.

Rev. Sts. c. 125, § 1.   By St. 1858, c. 154, now R. L. c. 207, § 1, murder committed with deliberately premeditated malice aforethought, or in the commission of an attempt to commit any crime punishable with imprisonment for life, or committed " with extreme atrocity or cruelty," was declared to be murder in the first degree and punishable with death.   Murder not appearing to be in the first degree was declared to be murder in the second degree, and punishable with imprisonment for life.   Shortly after the passage of the statute, it was held that it did not change the common law definition of murder as recognized by our courts, but simply manifested the intention of the Legislature to consider murder as a crime " the punishment of which may be more or less severe according to certain aggravating circumstances, which may appear on the trial."   *Commonwealth* v. *Gardner,* 11 Gray, 438, 444.   *Commonwealth* v. *Desmarteau,* 16 Gray, 1.

In the case at bar the only ground upon which it was contended by the Commonwealth that this was murder in the first degree was that it was committed with deliberately premeditated malice aforethought.   We are of opinion that in defining that phrase the court laid down the law as it has been held ever since the passage of the St. of 1858, and that both by reason and by authority it is sound.   The reasons for such an interpretation of the phrase are so clearly stated in the language of the various judges who have had occasion to expound to jurors the law on this subject that it seems necessary to do little more than quote their language.

One of the earliest cases after the statute of which we have any accessible report is *Commonwealth* v. *Andrews.*   That case was tried in October, 1868, in this court, before Chapman, C. J., and Foster, Wells and Colt, JJ., being four of the six justices of which this court was then composed, and sitting as a full court. In charging the jury, Chapman, C. J., speaking for all the judges present, after defining malice, proceeds to speak of the word " aforethought " as used in connection with malice in the common law definition of murder, and uses the following language : " The term ' aforethought' indicates simply what is thought of beforehand or premeditated.   But by the common law, malice aforethought was held to be sometimes implied, when there was no premeditation.   For example : If a man who was provoked to

sudden anger by mere words took a deadly weapon and killed, the offender, the law implied malice aforethought, because words are no adequate provocation for such an act as this.   There were other cases of the same character.   This feature of the law was regarded too severe, and our Legislature, several years ago, modified it by statute." He then quotes St. 1858, c. 154, then Gen. Sts. c. 160, § 1.   It is interesting in passing to note how nearly the illustration given corresponds with the one given by Shaw, C. J. in *Commonwealth* v. *Webster*, 5 Cush. 295, 305, *ad finem*, and how the statement of the reason for the passing of the statute is reinforced by the following language of Shaw, C. J. in *Commonwealth* v. *Gardner*, 11 Gray, 438, 443: " This statute does not declare for the first time that murder in the first degree shall be punished with death; it declares it in almost the same words as before.   It takes very nearly the same distinction which the common law took between murder by express, and that by implied malice."

Chapman, C. J. having given the reason for the passage of the statute as above stated, quotes the statute at length, and proceeds as follows to expound the meaning of the phrase " deliberately premeditated malice aforethought " : " To premeditate is merely to intend beforehand.   It need not be a long time ; it merely requires time to form a clear intent.   For example, a robber with a pistol or dirk, walking in the street, turns a corner, and meets a bank messenger with a roll of bills. In a moment he determines to get it ; the next moment he shoots or stabs the messenger dead, takes the package and flees. His malice was deliberately premeditated, though it occupied but a few seconds ; for it was a cool act of the will, and is unlike the intent stimulated by a sudden fight or quarrel, where one kills another suddenly, not having intended violence beforehand.   The malice and premeditation are actual, and are not merely inferred from the use of a deadly weapon."   See Davis's report of *Commonwealth* v. *Andrews*, printed by Hurd and Houghton, 246, 247.

St. 1872, c. 232, provided that a capital trial might be conducted by two justices of this court instead of a quorum of the full court, and after the passage of that statute such trials were carried on before only two judges.   In *Commonwealth* v. *Sturte-*

*vant*, (see Appendix in Wharton on Homicide, 743, 744; also MSS. report in Suffolk Law Library, vol. 2, page 6 of the charge,) tried in 1874 before Wells and Ames, JJ., the former in the charge to the jury said : " It is the intent of the statute to make murder in the first degree only of those cases where the murder is of such a character as to show a deliberate purpose. But deliberation does not require any considerable length of time. The mind deliberates rapidly, sometimes instantaneously, going from its premises to its conclusions in an instant of time ; so that a deliberately premeditated murder with malice aforethought may result from an intent to kill which the mind conceived the instant before the weapon was taken or the blow struck." In the same year, in *Commonwealth* v. *Pomeroy*, (see Appendix in Wharton on Homicide, 754, 755 ; also MSS. report in Suffolk Law Library, 255, 256,) tried before Gray, C. J. and Morton, J., afterward chief justice, the former, in charging the jury, spoke as follows in defining the phrase in question : " If you hear that phrase now for the first time, perhaps it seems to be a heaping up of words having no meaning ; but if you stop and think of it, you will see that the words 'deliberately premeditated malice aforethought' mean simply — thought upon, resolved upon beforehand ; not done suddenly, not a thing that comes into the mind in a moment, and is done before there is time to think about it, but a thing either thought of or planned some time before, or, if not planned long before, thought upon long enough before the act is done, or the blow struck, so that it can be said, reasonably, to have been purposed. No length of time is necessary. Sometimes long preparation is made, sometimes a firm determination is made, completed and acted upon very shortly. The law does not prescribe any limit of time ; does not attempt to define the quickness with which the human mind can act. If it is thought upon reasonably beforehand, that is sufficient to make it murder in the first degree." In *Commonwealth* v. *Dwight*, (see MSS. report in Suffolk Law Library,) tried also in the same year before Gray, C. J. and Endicott, J., the same judge instructed the jury on substantially the same line, saying among other things : " It is only necessary that it [the act of homicide] is thought upon and resolved upon beforehand. . . . It is not sufficient . . . that it should be the fruit of sudden

impulse, without any reflection, deliberation, resolution, determination or thinking it over. But on the other hand the law does not undertake to fix any time within which the human mind must act or which may be necessary to form a resolution. The only question is ' Was it thought upon, resolved upon, determined upon beforehand ? ' " And in the case of *Commonwealth* v. *Pemberton*, (see MSS. report in Suffolk Law Library, p. 17 of the charge,) tried in June, 1875, the same judge, sitting with Devens, J., charged as follows : " The law does not undertake to say how long it will take you to make up your mind on a given subject, so as to resolve and determine of set purpose to carry it out, — whether it will take days or hours or minutes or seconds ; but in order to constitute ' deliberately premeditated malice aforethought,' the act must have been thought upon, resolved upon, determined upon beforehand, no matter how long or short a time ; it must not be committed as the result of a mere sudden impulse, but must be the offspring of a resolution of the mind."

Perhaps one of the most instructive charges upon the question is that given in the case of *Commonwealth* v. *Frost*, (see MSS. report in Suffolk Law Library, pages 17, 18, 19 of the charge,) which was tried at Worcester in October, 1875. The defendant admitted the homicide, and the only real question was whether it was murder in the first degree, as contended by the Commonwealth, or only manslaughter, as admitted by the defendant. The attention of the court therefore was sharply drawn to the true definition of murder in the first degree. In his charge, Devens, J., after speaking of the phrase in question and saying that in order to constitute murder in the first degree it " must be shown beyond a reasonable doubt that the murder was done in pursuance of a previously formed plan, which previously formed plan was completed by the act of killing," proceeded as follows : " It is necessary to show that the intent preceded the act by some definite and distinct period of time, so that we can say that the act was the consequence of that premeditation. But it is unnecessary that any great length of time should precede. Length of time may be of importance in the consideration of a jury as to whether or not it is shown to have been a deliberately premeditated murder; but if the length of

time is brief, if there is a distinct period which does intervene between the premeditation and the act, that is long enough. I take the illustration which was used by the attorney general [Train] in his argument, and which was an illustration occasionally used by the late Chief Justice of this court [Chapman] in illustrating this subject. If one sees another going along the street with a watch, or a bundle of money in his pocket, or in his hand, and, in order to get that money he shoots him, with a view to possessing himself of that money, although he never saw the man before, so that there is no personal malice against the individual who carries the money, and although he did not expect to meet him upon the street, and formed the design merely because he did meet him upon the street, and found himself armed and thought he could accomplish his wicked purpose, the jury would be justified in finding, upon that evidence, that there was the 'deliberately premeditated malice aforethought' contemplated by the law." Perhaps the most concise definition of this phrase is found in the charge in *Commonwealth* v. *Piper*, (see State ed. 920,) tried in January, 1876, before Lord and Colt, JJ. The former, in speaking of the time, said to the jury: "What is necessary is, that the person shall intend to kill; he shall unlawfully intend to kill; and he shall kill in pursuance of a purpose which he has formed previously to his putting it into execution. Where the word and the blow come together it is not deliberately premeditated malice aforethought; but where the purpose is resolved upon and the mind determined to do it before the blow is struck, then it is, within the meaning of the law, deliberately premeditated malice aforethought."

We have thus reviewed to some extent the opinions of the various judges of this court as expressed by Chapman, C. J. in *Commonwealth* v. *Andrews*, where a quorum of the court was present, and afterwards by the judges in their respective charges to the jury in other cases as to the meaning of the term in question. We are aware of no discordant note. The various extracts speak for themselves. In substance the view expressed is that while it must be shown that a plan to murder was formed after the matter had been made a subject of deliberation and reflection, yet in view of the quickness with which the mind may

act, the law cannot set any limit to the time. It may be a matter of days, hours, or even seconds. It is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds.

Since jurisdiction over capital offences has been transferred from this court to the Superior Court, our attention has not been called to any case where the court has failed to adopt the same view, while it appears from such examination as we have made of the charges in that court that this view has been uniformly followed. See for instance *Commonwealth* v. *Borden*, (see typewritten report in Superior Court lobby, vol. 2, p. 1889,) tried in Bristol, *Commonwealth* v. *Trefethen*, (State ed. 218, 381,) tried twice in Middlesex, and *Commonwealth* v. *O'Neil*, (State ed. 704, 705,) tried in Franklin.

Eminent counsel, determined if possible to free their clients, and fertile in resources in that direction, frequently have acted for the defence in capital cases; and yet our attention has not been called to any case either in this court or the Superior Court, and we are not aware of any, where this definition of the phrase in question has been challenged except in the case before us. Upon this subject we have been referred by the defendant to cases in other States, but upon the construction of our own statute they are of little assistance, and it is not necessary to discuss them. So far as they are inconsistent with the doctrine above laid down we cannot follow them.

For more than a generation this view of the meaning of the phrase in question has been adopted in the courts of this State, and men whose right to life hinged upon its accuracy have been tried, convicted and sent to death. The Legislature, in the light of this uniform and long continued construction of the statute, has made no change.

The interpretation of the phrase given in the case at bar is in accordance with the law as previously laid down with great clearness and uniformity by justices in charging juries; is suggested by the hardship in the old law set forth by Chapman, C. J., as hereinbefore recited; is in accordance with the rapidity of mental action; and is founded upon sound sense as applied to

the subject; and we are satisfied that it is correct. The charge of the court, including the illustration of which the defendant complains, furnishes the defendant no ground for a valid exception.

17. We have noticed all the exceptions argued upon the defendant's brief. There are one or two which he has not argued. In view of the nature of the case and of the statement made by his counsel that nothing was waived, it is sufficient to say that, considering them as not waived, we have examined them and see nothing in them.

18. After a verdict of guilty of murder in the first degree, the defendant made a motion for a new trial. One of the reasons assigned for the motion was that one of the jurymen during the trial took notes or memoranda of the testimony of the witnesses "in violation of law and this defendant's rights."

As to this matter it may be said in the first place that it is difficult to see how the counsel for the defence could help seeing that the juror was taking notes of some kind. The juror used sheets of paper "about six by four inches in dimensions, with a lead pencil, resting upon his hand and knee, as the case might have been, and so wrote memoranda" of the testimony as it was going in. "This was done openly, frequently, while the counsel for the defence were immediately in front of him and in his plain view, either while examining witnesses or exhibits." The trial of the case lasted three weeks, and these notes were taken daily "with the possible exception of the first day or two." The juror was seated on the second row of jury seats, at the end nearest the bench and witness stand. It is very difficult for any one familiar with the arrangement of our court rooms, to conceive how so conspicuous an act, so continuously and openly performed by a juror seated so prominently within the view of all in the court room, especially of those within the bar, could have escaped the attention of the defendant and every one of his counsel. And, as stated by the Commonwealth in its brief, there is nothing in the affidavit of the defendant or of his counsel, which is inconsistent with the theory that they each saw the act of the juror and that he was writing. They simply say that they did not know he was taking notes of the evidence. In a certain sense that may be

true, and yet, if they saw the juror writing while the evidence was going in, they should be held to reasonable diligence in ascertaining what he was doing. In the mind of a person seeing a juror continuously writing while testimony is going in, the most reasonable inference would be that the juror was taking notes of the testimony.

But however that may be, we are of opinion that while as a rule the taking of notes of testimony by a juror may not be a commendable practice, yet by the great weight of authority it is not illegal, and as matter of law it does not require the setting aside of the verdict.

The question therefore was left to the discretion of the court. The court having heard the motion upon the evidence, in which the juror made affidavit that he took the notes "in aid of memory," filed a written statement of its decision, and the grounds thereof, the last part of which is as follows: "We rule that the evidence does not require us as matter of law to set aside the verdict on this ground. We do not find that any of the prisoner's rights have been at all affected by the taking of these notes, or that the action of this juror has in any way worked to his prejudice; and we are satisfied that no injustice to him has resulted from this circumstance. We therefore, in the exercise of our judicial discretion for the furtherance of justice, decline to set aside the verdict upon this ground." The evidence justified their conclusions as to the facts, and upon those conclusions no error of law is shown in declining to set aside the verdict.

*Exceptions taken at the trial, and those taken on the motion for a new trial, overruled.*