[No. 14407. Department One. March 15, 1918.]

THE STATE OF WASHINGTON, *Respondent,* v. DOMINIQUE LAZZARO, *Appellant.*[1]

PROSTITUTION—ACCEPTING EARNINGS—EVIDENCE — SUFFICIENCY. A conviction of accepting the earnings of a prostitute is sustained by evidence that the accused demanded and received the same in return for a promise of protection as a deputy sheriff.

SAME—ACCEPTING EARNINGS—EVIDENCE OF INCOME. In a prosecution for accepting the earnings of a prostitute, in which the defendant testified that he lived on his pay as a special deputy sheriff, it is error to show in rebuttal that such pay was negligible, where the jury was told that it went to the "motive" and to the "probability" of his commission of the crime, and would go more than to the credibility of the witness.

Appeal from a judgment of the superior court for King county, Smith, J., entered April 3, 1917, upon a

[1]Reported in 171 Pac. 536.

trial and conviction of accepting the earnings of a prostitute. Reversed.

*Vanderveer & Cummings,* for appellant.

*Alfred H. Lundin, John D. Carmody,* and *Joseph A. Barto,* for respondent.

WEBSTER, J.—The appellant, by an information filed in the superior court of King county, was charged with accepting five dollars, on June 15, 1916, the earnings of Mary Medaini, a prostitute. He was convicted and appeals.

In support of the charge, the state introduced testimony tending to establish these facts: Mary Medaini, a coal miner's widow, with her two small children, moved to Seattle from Ravensdale, Washington, February 5, 1916, and rented a rooming house. This venture proving unprofitable, she gave it up and, with her children, went to live with Mrs. Dilauro on Rainier avenue, with whom appellant was rooming. Thereafter appellant volunteered to find her employment at a lodging house conducted by Mrs. Olson, telling her: "I know lots of girls make lots of money, you nice woman, you make lots of money, too. You talk Italian, French, and I think you going to make good money there." Later she went to this house, where she practiced prostitution, the appellant coming to see her frequently and taking her earnings, promised her protection by virtue of his position as special deputy sheriff. On June 15, 1916, while Mary Medaini and her friend Mrs. Jovanelli were in the Columbus restaurant in Seattle, appellant demanded of her five dollars, stating that he wanted it for gambling, which amount she gave him from money earned in the practice of prostitution. This is the transaction upon which the information is based.

The defendant admitted requesting and receiving this money, but claimed that Mrs. Dilauro, who was then caring for and boarding the Medaini children, had instructed him to collect from Mary Medaini money to pay for the children's keep, and that the five dollars so paid to him had been delivered to Mrs. Dilauro. In this he was corroborated by the testimony of Mrs. Dilauro and Mrs. Jovanelli. Appellant further testified that, on another occasion, he had received from Mary Medaini $3 with which to buy a pair of shoes for Mrs. Dilauro in part payment of her claim for boarding the children. He also testified that, on January 5, 1916, he loaned Mary Medaini $35 to defray her expenses in moving to Seattle, in all of which he was corroborated by other testimony. No claim is made by appellant that the five dollars paid by Mary Medaini in the Columbus restaurant was exacted or received in part payment of the loan.

It is first contended that the evidence is insufficient to sustain the verdict. From what has already been said, it is manifest that there was competent evidence tending to establish every essential element of the crime. The weight and sufficiency of the evidence was for the jury.

During the course of the trial, Lila Watkins was called by the state as a witness in rebuttal. After showing that she was a bookkeeper in the sheriff's office and was familiar with the records of that office, she was asked this question: "I will ask you whether or not you have examined the records of your office recently and know from that examination what, if any, moneys were paid to Dominique Lazzaro?" The defendant seasonably objected to the question, and after a lengthy argument in the presence of the jury, the court observed:

"Now this goes to the motive and to the probability of the crime having been committed by this plaintiff (defendant) as to whether or not he had means himself of support, or whether he was likely by reason of his own negligence, or his own lack of means and support, to resort to a matter of this sort to raise money. He stated before the jury, under oath, the amounts of money which he received from time to time from the county, indicating thereby there was no reason why he should attempt to secure money the way it is charged he did try to secure it. I think it would go more than to the credibility of the witness. It would go to the question of the probability of whether he would commit a crime of this sort for the purpose of obtaining money to ascertain what amount of money he was receiving. He says he received no funds from any source, that he got his entire living from his salary or his perquisites from the sheriff's office. Now, I think the jury should have the opportunity of being informed both as to the matter of credibility and also as to his own financial resources, as to what money he did receive and what money he had."

The objection was overruled and exception noted, and the witness was permitted to testify that, during the year 1915, appellant had received in the aggregate $199.70, as salary and expenses as deputy sheriff, and that, for the year 1916, to the first of October, he had received the sum of $3. The admission of this testimony is assigned as error. The record discloses that, during his examination in chief, the appellant testified as follows:

"Q. What kind of work did you do under Mr. Hodge? A. I do whatever work he told me to do. Q. Were you a regular deputy or a special deputy? A. Well, he give me three dollars a day. Q. You didn't draw pay unless you worked however? A. Yes, that's right. Q. What is it? A. Yes, I have to work to get pay, sure. Q. You didn't draw a salary? A. No."

On cross-examination, the state's attorney went at length and in detail into the amounts received by ap-

pellant during the time he was special deputy sheriff, in an effort to show that appellant had not earned a living in that employment. As no claim was made by appellant that the five dollars paid to him was received in part satisfaction of the loan alleged to have been made to Mary Medaini on January 5, 1916, the sole legitimate purpose of the cross-examination was to affect the credibility of the witness. Had such claim been the theory of the defense, it would perhaps have been competent to show in rebuttal the defendant's financial condition at or about the time of the loan as bearing upon the question whether, in fact, such loan had been made. In any event, the amount of compensation received by appellant to October 1, 1916, was incompetent to refute the making of the loan, were that a material issue in the case. The facts elicited upon cross-examination related to an immaterial and collateral matter, which, under elementary principles, is not a proper basis for impeachment.

But conceding, for the sake of argument, that the rebuttal testimony was competent as tending to affect the credibility of appellant, the court, in the presence of the jury, ruled that it was admissible for a much broader and altogether different purpose when it said: "This goes to the *motive* and to the *probability* of the crime having been committed by this defendant, as to whether or not he had means himself of support or whether he was likely by reason of his own negligence, or his own lack of means and support, to resort to a matter of this sort to raise money. . . . I think it would go *more* than to the credibility of the witness." This statement of the court related to the admissibility of evidence showing appellant's income at a time nine months subsequent to the making of the alleged loan, and more than three months after the commis-

sion of the crime charged; moreover, it suggested to the jury this process of reasoning: Appellant was not earning a living income in the sole occupation in which he was engaged. He therefore needed money; in order to get it, he committed the crime of accepting the earnings of a prostitute. No other construction can be placed upon the language than that the rebuttal testimony furnished a motive for and rendered probable the "resort to a matter of this sort to raise money." This assumes that a poor man is more likely than a rich man to commit a crime for the purpose of obtaining money, and is as contrary to human experience as it is to the law.

The rule is stated by Professor Wigmore in this language:

"The *lack of money* by A might be relevant enough to show the probability of A's desiring to *commit a crime* in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence." 1 Wigmore, Evidence, § 392.

Another author has said:

"Evidence that the defendant had always been poor, or was living extravagantly and beyond his means, or that he was generally reputed to be in good circumstances, or as to *the wages he was receiving,* either before or after the larceny, is likewise inadmissible." Underhill, Criminal Evidence (2d ed.), § 304.

The supreme court of Indiana, in *Reynolds v. State,* 147 Ind. 3, 46 N. E. 31, observes:

"If evidence that appellant was worth $800 in real estate was admissible for the purpose of showing that he had no motive, then it would seem that it would be competent for the state to prove, as showing motive,

that he had no property, or only a small amount of property. It would resolve itself into the proposition that men who are poor are constantly under the temptation to rob their more fortunate neighbors, and that they need only the opportunity to yield to the temptation. In other words, proof of poverty tends to show a motive for the crime of larceny or robbery, while proof of riches tends to show a want of motive. Among the motives recognized as impelling men to commit crime is the desire of gain. . . . This motive, however, has influenced the conduct of rich persons as well as poor persons. Men do not steal or rob except as they have a desire to do so; but such desire does not come so much from the poverty of the individual as from the absence of a moral sense, and desire to possess at all hazards something that does not belong to him. The evidence was properly excluded from the jury."

The supreme court of Massachusetts in considering this question said:

"It is argued by the defendant that before the law the rich and the poor stand alike, and that the poverty of the defendant is not admissible to show a motive in him to commit the crime with which he is charged. All this may be conceded to be true. As stated by Bigelow, C. J., in *Commonwealth v. Jeffries,* 7 Allen, 548, 565, 566, 'It is doubtless true that in a large class of cases the poverty or pecuniary embarrassments of a party accused of crime cannot be shown as substantive evidence of his guilt. The reason for the exclusion of such evidence is, that in those cases there is no certain or known connection between the facts offered to be proved and the conclusion which is sought to be established by it. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish. It does not follow because a man is destitute that he will steal, or that when embarrassed with debt and incapable of meeting his engagements he will commit forgery.' Mere poverty considered apart from all other facts

tending to connect the accused with a crime never can tend to show criminal intent or criminal motive." *Commonwealth v. Tucker,* 189 Mass. 457, 76 N. E. 127, 7 L. R. A. (N. S.) 1056.

See, also, *Snapp v. Commonwealth,* 82 Ky. 173; *Dorsey v. State,* 110 Ala. 38, 20 South. 450; *Commonwealth v. Stebbins,* 8 Gray (Mass.) 492.

It·must be borne in mind that the appellant is not charged with living off the earnings of a prostitute, but with a specific offense—the acceptance of five dollars on June 15, 1916, earned in the practice of prostitution. His means of livelihood, therefore, was purely collateral to the issue in the case. The rebuttal testimony, in the respect complained of, was clearly inadmissible and highly prejudicial, necessitating a reversal of the case.

In view of the conclusions reached, a discussion of the other assignments of error is unnecessary. The judgment is reversed, and the cause remanded for a new trial.

ELLIS, C. J., PARKER, MAIN, and FULLERTON, JJ., concur.