CONNOR ET AL., PLAINTIFFS IN ERROR, v. THE PEOPLE OF THE STATE OF COLORADO, DEFENDANTS IN ERROR.

1. LARCENY.

To constitute the crime of larceny at common law there must be a trespass, that is, a taking of property without the consent of the owner, coupled with an intent to steal the property so taken.

2. SAME.

The crime of larceny is not committed when the property is taken with the consent of the owner, even though such consent was given for the purpose of entrapping the person suspected, and the doer of the act did not know of the existence of the circumstance which prevented the criminal quality from attaching.

3. CONSPIRACY.

A conspiracy to do an act does not constitute a crime, unless the act to accomplish which the conspiracy is formed would be unlawful, if committed.

4. CRIME NOT TO BE ENCOURAGED.

When in their zeal, or under a mistaken sense of duty, detectives suggest the commission of a crime and instigate others to take part in its commission in order to arrest them while in the act, although the purpose may be to capture old offenders, their conduct is not only reprehensible, but criminal, and ought to be rebuked rather than encouraged by the courts.

5. EVIDENCE.

Evidence that a witness has, on other occasions, made statements similar to what he has testified in the cause, is inadmissible. It is a general rule that what the witness has said out of court cannot be received to fortify his testimony.

*Error to the District Court of Arapahoe County.*

ON the 8th day of June, 1889, James Connor, Charles Connor and James Marshall were indicted in the district court of Arapahoe county for a conspiracy to rob the D. & R. G. R. Company. The indictment contained five counts, charging the offense in various forms.

On the 5th day of October, 1889, the cause came on for trial, and upon the 28th day of October, 1889, a verdict of guilty against the defendants was returned upon all the

counts of the indictment. Motions for new trial and in arrest of judgment were filed and overruled, and they were sentenced under the verdict upon the first count of the indictment to imprisonment in the county jail, and to pay a fine and costs. They bring the case here for review and present numerous assignments of error as grounds for reversal of such conviction and sentence.

Messrs. Rhodes & Carpenter and Mr. Charles Hartzell, for plaintiffs in error.

Mr. J. H. Maupin, attorney general, and Mr. John G. Taylor, for defendants in error.

Mr. Justice Goddard delivered the opinion of the court.

We omit the discussion of many of the errors assigned, not because we regard them as without merit, but because those considered are more important and are decisive of the case.

The vital and important question presented by the record is, whether under the evidence, any crime is shown to have been committed. The crime charged is a conspiracy entered into by the defendants below, plaintiffs in error here, to rob the D. & R. G. R. Company. The statute defines a conspiracy as follows:

" If any two or more persons * * * shall agree, conspire or co-operate to do or aid in doing any other unlawful act," etc.

To constitute the crime there must be not only an agreement to co-operate to do a certain act, but that act must be unlawful. The unlawful act to be done in pursuance of the conspiracy as charged in the indictment was the commission of a larceny in taking the property of the D. & R. G. R. Company.

The evidence introduced on the trial to sustain the fact of confederation between the plaintiffs in error was the testi-

mony of the witness Holliday, *alias* Ward, which in effect is that he was in the employ of Thiel's Detective Agency, of St. Louis, Mo., and was sent to Kansas City on a special mission to find out if one James Marshall corresponded with the police department of Denver, and also to find out if he knew anything about the First National Bank robbery; that he met Marshall and learned from him that the chiefs and heads of the police department in Denver were his friends, and would co-operate with him, or anyone he should introduce, in any unlawful scheme, and upon obtaining promise of a letter of introduction to them from Marshall, he, Holliday, returned to St. Louis, to report to his superiors what he had done. That his superiors suggested that he devise a scheme to rob an express company, planning such robbery like one that had taken place in Missouri. On the 9th day of April he returned to Kansas City, and on meeting Marshall again he told him that he had a friend in New York who knew a messenger who run out of Denver, and from whom he could get a letter to such agent; that he had written for the letter and it would be in Denver in a few days; that Marshall expressed a hope that it was on the D. & R. G.; that he obtained the letter of introduction to James Connor, and agreed with Marshall to let him know where he was stopping in Denver, and to wire him before the robbery so he could come on and take part. On his arrival in Denver, and on the 12th of April, he presented his letter of introduction to James Connor, and stated to him the same in reference to a letter to an agent; that he, Connor, expressed the hope that it was over the D. & R. G.; that on the 13th of April he met Farley, who was then resident manager of Thiel's Detective Agency in Denver.

"Told Farley I had a talk with Connor. * * * Up to this time I had done what I did from instructions from the St. Louis office. After this I was under instructions from Farley.

"Q. When did you first discuss the plan of the robbery,

and with whom did you first talk about the plan of operations to rob this road?

" A. I think it was with Mr. Farley at 31 and Curtis. We discussed the D. & R. G. road, when I told him what I had learned from the defendants."

That a letter was prepared in Mr. Farley's office, with the consent of the officers of the company, purporting to be written by one William S. Buell of New York, to Icon, an express agent in the employ of the D. & R. G. Express Company, introducing to him Mr. Holliday as Joe Ward; that plans were devised between Holliday and Connor to carry out the robbery.

Mr. Farley testifies that on the night of the 13th of April, after meeting Holliday, he saw Mr. Gillooly, treasurer of the D. & R. G. R. Company, and told him what Holliday had said. And it appears from the evidence, from that time on the company through its officers not only consented that their property might be taken, but co-operated with the witness Holliday, through Farley, in perfecting plans by which such taking might be accomplished.

Mr. Gillooly testifies that:

" Holliday was in the employ of Thiel's Agency; Thiel was in our employ. Whatever Mr. Holliday did was being done with the full knowledge and consent of the company. This scheme was being worked for nearly a month."

To constitute the crime of larceny at common law there must be a trespass, that is, a taking of property without the consent of the owner, coupled with an intent to steal the property so taken. It is therefore evident that the crime is not committed when with the consent of the owner his property is taken, however guilty may be the taker's purpose and intent. This is the accepted doctrine as laid down by the various text writers on criminal law.

Mr. Bishop, discussing this principle in the fifth edition of his work on criminal law, § 262, says:

" The cases of greatest difficulty are those in which one, suspecting crime in another, lays a plan to entrap him; con-

sequently, even if there is a consent, it is not within the knowledge of him who does the act. Here we see, from principles already discussed, that, supposing the consent really to exist, and the case to be one in which, on general doctrines, the consent will take away the criminal quality of the act, there is no legal crime committed, though the doer of the act did not know of the existence of the circumstance which prevented the criminal quality from attaching : " 2 Archbold Crim. Practice and Pleading, 1181 ; 2 Russell on Crimes, 190 ; 3 Chitty Crim. Law, 925 ; 1 Whart. Crim. Law, § 914.

To the same effect is the uniform current of the decisions. In the case of *Regina v. Johnson*, 41 Eng. C. L. R. 123, it was held that where a servant pretended to concur with two persons who proposed to rob his master's house, and acting under the advice of the police he opened the door for them to enter, that there could be no conviction of burglary.

Of the same purport is the case of *Allen v. The State*, 40 Ala. 334, wherein it is said :

" Where the proof showed that the prisoner proposed to a servant a plan for robbing his employer's office by night; that the servant disclosed the plan to his employer, by whom it was communicated to the police; that the master, acting under the instruction of the police, furnished the servant with the keys of his office on the appointed night; that the servant and the prisoner went together to the office, where the servant opened the door with the key and they both entered through the door, and were arrested in the house by the police, *held,* that there could be no conviction of burglary."

In the case of *Speiden v. The State*, 3 Texas Court of Appeals, 163, the defendant was indicted for burglary by breaking into a bank with intent to commit theft. The court say :

" In the case at bar the detectives cannot be considered in any other light than as the servants and agents of the bankers, Adams & Leonard. They, the detectives, had the legal occupancy and control of the bank; two of them made arrangements with defendant to enter it; and defendant, when

arrested, had entered the bank at the solicitation of those detectives, who were rightfully in possession, with the consent of the owners. This cannot be burglary in contemplation of law, however much the defendant was guilty in purpose and intent."

In *Dodge v. Brittain*, Meigs, 83, it is said:

" Receiving goods with the owner's consent, from his servant, is not larceny, it being of the essence of the offense that the goods be taken against the will of the owner, *invito domino.*"

Of the same purport are *Kemp v. The State*, 11 Humphrey, 220; *State v. Chambers*, 6 Ala. 855; *Zink v. People*, 77 N. Y. 114; *U. S. v. Whittier*, 5 Dillon C. C. 35; *State v. Covington*, 2 Bailey, 569, and numerous other cases that might be cited.

Counsel for the people concede the soundness of the doctrine as above announced, but seek to escape its application upon the ground that the plaintiffs in error were not prosecuted for stealing from the railway company, and therefore the attitude of the company made no difference. In other words, it is contended that the conspiracy to do an act constitutes a crime, although the act to accomplish which the conspiracy is formed would not be unlawful if committed. To state the proposition is to refute it.

We think the law applicable to this case is clearly and correctly stated. In the case of *Johnson v. The State*, 3 Texas Court of Appeals, 593, the court say:

" The fact of such conspiracy once being established, the subsequent consent of the owner (or those acting for him) for the conspirators to enter the building will not affect their guilt in the least, unless the evidence shows that Higgins and Garwood, or the detective employed by them, suggested the offense, or in some way created the original intent or agreement to commit the offense as charged."

In the case of *Saunders v. The People*, 38 Mich. 218, the defendant was convicted of breaking and entering by night a court room, and feloniously taking therefrom certain bonds.

The defendant Saunders was a lawyer, and it was shown in evidence that he asked Webb, a policeman, to leave the door of the court room unlocked in order that he might get the bonds ; and that Webb, after consulting with his superior officer, consented, and then lay in wait, and caught one Moylan removing the papers. The supreme court of Michigan, composed of Judges Campbell, Cooley, Marston and Graves, reversed the conviction, and severely denounced the conduct of the officers in conniving with persons suspected of criminal designs for the purpose of arresting them in the commission of the offense.

Judge MARSTON, concurring in a separate opinion, pages 221 and 222, says :

" The course pursued by the officers in this case was utterly indefensible. Where a person contemplating the commission of an offense approaches an officer of the law, and asks his assistance, it would seem to be the duty of the latter, according to the plainest principles of duty and justice, to decline to render such assistance, and to take such steps as would be likely to prevent the commission of the offense, and tend to the elevation and improvement of the would-be criminal, rather than to his farther debasement. Some courts have gone a great way in giving encouragement to detectives in some very questionable methods adopted by them to discover the guilt of criminals; but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing. The mere fact that the person contemplating the commission of a crime is supposed to be an old offender can be no excuse, much less a justification for the course adopted and pursued in this case."

CAMPBELL, C. J., also concurring, at page 223, said :

"Assuming that there is not in the record full evidence of such an invitation to enter the clerk's office as would conclu-

sively show there was no breaking, the encouragement of criminals to induce them to commit crimes in order to get up a prosecution against them is scandalous and reprehensible."

We feel warranted in quoting thus fully from these opinions, because the views therein expressed are specially pertinent to the facts in this case, and because of the universally recognized learning and ability of the eminent jurists who announced them.

In the case under consideration, the only evidence of the inception of the scheme to rob the express company is that of Holliday, who states that it was instigated by his superiors at St. Louis, and by him suggested to the plaintiffs in error. It further appears that before the consummation of the conspiracy the officers of the express company were informed and consented to the scheme. Hence, under the foregoing authorities the prosecution cannot be sustained.

We do not wish to be understood as intimating that the services of a detective cannot be legitimately employed in the discovery of the perpetrators of a crime that has been or is being committed, but we do say that when in their zeal, or under a mistaken sense of duty, detectives suggest the commission of a crime and instigate others to take part in its commission in order to arrest them while in the act, although the purpose may be to capture old offenders, their conduct is not only reprehensible, but criminal, and ought to be rebuked rather than encouraged by the courts. And, accepting the version of the witness Holliday as true, it shows a state of facts that can have no place in the decent administration of justice.

The witnesses Farley and Newcome were permitted, over objection, to testify to statements made to them by the witness Holliday, not made in the presence of plaintiffs in error or either of them. This was hearsay evidence and clearly inadmissible.

Counsel for the people attempts to justify the admission of this testimony upon the ground that the testimony of Holliday was attacked on cross-examination and his credibility

questioned, and therefore the people had a right to corrobo-rate him in this manner, asserting that such procedure was in conformity to well established authorities.   No authority is cited, and upon a full and careful research we feel safe in asserting that no authority can be found that will sanction the admission of this evidence.   In the language of Buller, J., 13 Doug. 242, " It is now settled that what a witness said, not upon oath, would not be admissible to confirm what he said upon oath."

Greenleaf in his work on Evidence, vol. 1, § 469, says :

" But evidence that he has, on other occasions, made state-ments similar to what he has testified in the cause, is not ad-missible."

In *Robb v. Hackley*, 23 Wend. 50, Bronson, J., in a very exhaustive opinion on this subject, says :

" But as a general, and almost universal rule, evidence of what the witness has said out of court cannot be received to fortify his testimony.   It violates a first principle in the law of evidence to allow a party to be affected, either in his per-son or his property, by the declarations of a witness made without oath.   And, besides, it can be no confirmation of what the witness has said on oath, to show that he has made similar declarations when under no such solemn obligation to speak the truth.   It is no answer to say, that such evi-dence will not be likely to gain credit, and consequently will do no harm.   Evidence should never be given to a jury which they are not at liberty to believe."

The only exception to this rule as stated by Greenleaf in the section above cited is :

" Where a design to misrepresent is charged upon the wit-ness in consequence of his relation to the party or the cause, in which case it seems it may be proper to show that he made a similar statement before that relation existed."

At the time of the admission of the testimony the plain-tiffs in error had made no attempt to impeach the witness Holliday ; nor did they at any time do more than to deny his

statements, when on the stand as witnesses in their own behalf.

The witnesses Farley and Newcome testified that they had no personal knowledge of the facts stated by Holliday, and were simply repeating the story told by him. The harmfulness of this can be readily seen. The witness Farley was at the time holding an important official position ; he was a respectable citizen and possessed the confidence of the community, and the repetition by him of Holliday's story might give it a weight and credibility greater than would have attached to it when told alone by Holliday.

However this may be, the admission of this testimony was so violative of every rule of evidence that in itself it would compel a reversal of the case, and it becomes unnecessary to notice the further objections so fully argued by counsel. For the reasons given the judgment will be reversed.

*Reversed.*