## No. 15,141.

### WELCH *v.* THE PEOPLE.

(170 P. [2d] 781)

Decided April 8, 1946.  Rehearing denied June 24, 1946.

Mr. WILKIE HAM, Mr. DONALD T. HORN, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

PLAINTIFF in error, hereinafter referred to as defendant, was returned guilty of stealing cattle. To reverse a penitentiary sentence entered upon that verdict he prosecutes this writ and assigns errors which may be thus properly grouped: 1. Insufficiency of evidence; 2. Prejudice of jurors; 3. Denial of a motion for a new trial on the ground of newly discovered evidence; 4. Deprivation of a fair trial because of incapacity of counsel; 5. Admission in evidence of Exhibit A3.

No detailed statement of the transaction out of which this prosecution grew would be in the least helpful in understanding the assignments or our reasons for

holding them devoid of merit. Such recital is therefore omitted.

■ 1. Perhaps no other record before this court has been scrutinized more carefully by all the Justices. It discloses many conflicts in the testimony and doubtless much perjury. Where truth and where falsehood lie is not for our resolution. The verdict testifies to the credence given by the jurors to that which supports it and permissible inferences deducible therefrom. We can not interfere with that verdict on this ground.

■ ■ 2. During the trial the jurors stayed at different hotels. In one group of them, White, stated to others that defendant was "no good"; that he held, or had held, two of his short checks. Another told White that he held such a check from "the Welches." The White checks referred to were for $1.50 each. There was no discussion of them after the case was submitted. It appeared that those mentioned by White had been given several years before the trial and not by defendant. These facts were developed on the hearing of the motion for a new trial. Since the motion was overruled we must assume that this loose jury talk was considered by the court as too trivial to have deafened any juror to his oath or colored his verdict. In so holding no abuse of discretion appears. True, the jurors involved testified that this "short check" talk did not influence their verdict. Such evidence was incompetent. *McLean v. People,* 66 Colo. 486, 180 Pac. 676; *McPhee v. People,* 108 Colo. 530, 120 P. (2d) 814. Many authorities hold it improper to admit evidence in impeachment of a verdict that extraneous considerations influenced concurrence therein, but even this rule has its well-recognized exceptions. *Wharton v. People,* 104 Colo. 260, 90 P. (2d) 615. Our attention has been called to no case in which it was held reversible error to admit statements by a juror that such considerations did *not* influence his verdict. Such testimony amounts to nothing more than the juror's assertion that he kept his oath and in the absence

thereof all presumptions are that he did so. However, a well established rule stamps this alleged error as clearly non-prejudicial. "The mere fact that [in a trial to the court without a jury] incompetent or immaterial evidence may have been introduced and admitted in evidence could not be said to be prejudicial [citing numerous authorities]. In such case the presumption is always indulged that the court considered only the competent evidence." *Garden City Feeder Co. v. Commissioner of Int. Rev.,* 75 F. (2d) 804.

■ 3. One ground of the motion for a new trial was newly discovered evidence. This alleged evidence falls into two classes, i. e., the impeachment of two witnesses, and facts appearing by the county records. One witness named was endorsed on the information, hence defendant had notice of his presumed information. One witness, whose impeachment is sought, testified only in rebuttal. The county records referred to were public and kept in the building where the trial was held. Their relevancy, if any, should have occurred to defendant and his counsel prior to the termination of the trial. None of this "newly discovered evidence" tends to negative defendant's guilt and there is no probability that any of it would change the result, hence the assignment is without merit. *Christ v. People,* 3 Colo. 394; *Miller v. People,* 92 Colo. 481, 22 P. (2d) 626; *Mitchell v. People,* 53 Colo. 479, 128 Pac. 61; *Edwards v. People,* 73 Colo. 377, 215 Pac. 855.

■ 4. It is contended that defendant failed to have a fair trial because of the physical and mental affliction of his leading counsel. In our opinion there is neither allegation, evidence nor argument supporting this con-. tention save as it applies to the following assignment. We so limit our consideration of it.

5. Exhibit A3 was a prior written statement made by the peoples' witness, Kohler. It was referred to by him on cross-examination and further developed and offered by the district attorney on re-examination to corroborate

the witness' testimony and so admitted over repeated objections. The question of the correctness of this ruling is largely responsible for the fact that this is the third opinion handed down herein. The first was by our then Chief Justice, Hon. John C. Young, affirming the judgment. Thereafter a rehearing was granted and by an opinion written by Mr. Justice Hilliard the judgment was reversed. Again a rehearing was granted and so the cause is again before us. Dissents were filed to each of said opinions.

This court has upheld the general rule that the admission of such statements for such purpose constitutes reversible error. *Connor v. People,* 18 Colo. 373, 33 Pac. 159; 25 L. R. A. 341; 36 Am. St. Rep. 295; *DePriest v. People,* 64 Colo. 358, 171 Pac. 1004; *Baker v. People,* 72 Colo. 68, 209 Pac. 791. There are, of course, certain well-recognized exceptions to this general rule. *Coates v. People,* 106 Colo. 483, 106 P. (2d) 354. The writer here simply records his opinion, on which the concurring Justices express no view, that the present case falls within the exceptions and that, were it otherwise, the rule is devoid of logical support and the foregoing authorities upholding it should be overruled. His reasons for that view are here omitted as immaterial since we base our refusal to sustain this assignment upon a different, and in our opinion impregnable, obstacle.

██ ██ The ruling, now so vigorously contested, was not called to the attention ˋof the lower court by defendant's motion for a new trial. The holding in this jurisdiction is that alleged errors not so presented will ˴not be considered here. *Eachus v. People,* 77 Colo. 445, 236 Pac. 1009; *Dockerty v. People,* 96 Colo. 338, 44 P. (2d) 1013. There are, of course, exceptions to this rule. These the grounded upon the overriding principle that in clear cases of the absence of sufficient evidence of guilt, or the gravest doubt thereof, we will go beyond the abstract and assignment and notice any reversible ˴

error disclosed by the record which is probably responsible for depriving defendant of a fair and impartial trial. *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71; *Paine v. People,* 106 Colo. 258, 103 P. (2d) 686; *Leech v. People,* 112 Colo. 120, 146 P. (2d) 346. Defendant's contention is that this assignment falls in that class. Our conclusion is that, considering its general character, the slight probability of its having influenced the verdict and the ample evidence of guilt, it does not. If prejudice is not patent and the error was not raised by the motion we will not consider it.

Mr. Granby Hillyer was leading counsel in this case as he had been in a preceding mistrial of it and it is contended that defendant suffered judgment because of his incapacity. We have disposed of this point, supra, save in so far as it relates to failure to include the admission of Exhibit A3 in the motion for a new trial. It is here urged that this failure was due to Mr. Hillyer's incapacity and that oversight so arising should in the interest of justice be included among those exceptions to the rule requiring that before such an error can be taken advantage of here it must be called to the attention of the trial court by motion for new trial and opportunity be there given to correct it. If the failure here apparent could reasonably be ascribed to counsel's affliction that position would certainly merit our most careful consideration. But that it can be so ascribed we are unable to assume from the record before us and from facts of which this court should take judicial notice.

That Mr. Hillyer was suffering from a most annoying and troublesome affliction is beyond question. But that this went further than an impediment in his speech does not appear from the record. This affliction had been of long standing. It was with him during the first trial of this cause, as well as the second, and was patent to everyone when he more than once appeared in this court in other causes. It apparently had no adverse

effect upon the skill and ability with which he presented matters in this tribunal and every page of this record, we think, bears testimony to the fact that it did not hamper him in the instant case. He was apparently easily a match for the district attorney at every turn in the litigation and safeguarded the interests of his client with skill and adroitness. Every ground save this was carefully set forth in his motion for a new trial. Out of an abundance of precaution and apparently in order to relieve him of unnecessary vocal strain the district court appointed Mr. Horn to assist him. His services were available in the preparation for a new trial as well as at every other stage of the proceedings. Under such circumstances we are unable in this case to include his affliction among the causes which constitute excuse for failure to comply with this well known rule. Moreover, portions of the record clearly demonstrate to us the mental capacity and astuteness of Mr. Hillyer.

Finding no reversible error in the record the judgment is affirmed.

MR. CHIEF JUSTICE KNOUS, MR. JUSTICE HILLIARD and MR. JUSTICE STONE dissent.

MR. JUSTICE HILLIARD dissenting.

I do not pause to discuss all the points which I am convinced should work reversal of the judgment, but in relation to the ones I shall emphasize, namely, (1) the admission in evidence of People's Exhibit A-3, and (2) the prejudicial conduct of some of the jurors, and particularly that of juror White, I regard the factual statement in the major opinion as inadequate for a proper understanding of the case. I venture, therefore, to undertake a more comprehensive review of the record.

Plaintiff in error and one Robert Kohler were jointly charged with grand larceny, in that they "did steal," as said, "two head of neat cattle of the value of $90.00,

of the personal property * * * of one Harley E. Shelden, * * * contrary," etc. Prior to this charge, Kohler had been charged individually in the same court with larceny of cattle, and shortly thereafter with the same crime in four other cases. He pleaded guilty in the first case, and was sentenced to the penitentiary, whence he was returned to testify as a people's witness in the instant case. Ultimately, there was nolle prosequi in the other cases, and, as to Kohler, in the joint charge here. Plaintiff in error was convicted as charged and suffered judgment of incarceration in the penitentiary.

Kohler, who lives across the state line in Oklahoma, admittedly sold and delivered the cattle to another Oklahoman and collected the agreed sale price in cash. He did not immediately execute and deliver to the purchaser a bill of sale, but subsequently, as he claimed, did execute one and left it with a filling station operator, from whom, presumably, the purchaser obtained it. Shelden, missing the cattle, made inqury and search and learned that they had been sold and delivered by Kohler as already stated. Kohler was charged preliminarily before a justice of the peace, and, flanked with an Oklahoma lawyer, he accompanied the prosecuting witness and an Oklahoma sheriff to the Colorado jurisdiction. When apprehended he claimed that November 11, 1938, he had bought the cattle from plaintiff in error, but admitted he did not have a bill of sale therefor or other writing covering the claimed transaction. He maintained, however, that plaintiff in error had promised to give him a bill of sale. More particularly, Kohler said, that, "When Roy [plaintiff in error] delivered the cows to our place he said that up in Colorado you need a bill of sale. I told him that I did not need one since I intended to keep the cattle around the place. He said that if I needed one he would give it to me." It is worthy of consideration, I think, to mention at this point that Kohler did not "keep the cattle around the place" of their claimed delivery, as

he said was his intention, but on "the same day" as he admitted, "I took the heifers to my brother Ewell's place," and "on or about the first half of December, 1938, I sold the two heifers to Bill King of Boise City, Oklahoma, for $60.00. He came for them at Ewell's place."

On the strength of Kohler's statement he was taken to the home of plaintiff in error in Baca County, the laid venue, were they found and confronted him with Kohler's statements, to which plaintiff in error made denial. Kohler waived preliminary examination and was held in bond to the district court. February 7, 1939, and while he was being so held, he signed Exhibit A-3. December 11, 1939, he resigned the exhibit and verified it before the clerk of the district court. It is to be remarked that Kohler, while selling the cattle for cash, as stated, testified he got them from plaintiff in error in exchange for three "pickup" truck loads of corn, to be delivered to the ranch of plaintiff in error's brother. This ranch was many miles from the home of plaintiff in error. Kohler testified that he made delivery of the corn on three different occasions, but only on the first, when he saw the brother's wife, as he further testified, did he see anyone. He simply dumped the corn in a metal container near the house and went his way. The Mrs. Welch he claimed to have seen, testified that no such delivery was made, nor, as her constant cognizance of the activities on the ranch justified her claim of opportunity to know, and as she further testified, did Kohler deliver other loads of corn on the premises. A daughter of this Welch family, of high school age, living at home, testified that Kohler made no such deliveries of corn at their place. References to the foregoing is not made on the theory that the jury was bound to believe Mrs. Welch and her daughter, nor is the relationship of the two Welch families being disregarded. It is fair to observe, however, that incentive to perjury on their part, as I conceive, was not

comparable to that of Kohler, whose testimony was calculated to further his fortunes in multiple prosecutions. There was nothing to indicate that the husband and father of the two witnesses was ever involved in evil deeds, nor was there showing or intimation that the latter were other than good and law abiding women. Considering the foregoing, plus the fact that Kohler not only did not have a bill of sale for the cattle, but, as he said, "did not need one," and the further fact that in the first instance he did not give his purchaser a bill of sale, his veracity and good faith generally stood challenged in high degree, as the experienced and able prosecutor was quick to recognize. Then it was, and "to show," as the district attorney openly and frankly declared, that Kohler "is telling the same story now, as he did in 1939," he induced the admission of Exhibit A-3 in evidence. In view of the fact that at an earlier trial of the case, and when the said exhibit was not offered or received in evidence, or, other than to the prosecution, was known to exist, the jury disagreed, its importance and probative influence may not be overestimated; and its competence for the purpose emphasized, repeatedly challenged in clear and unmistakable manner, became, and is, I respectfully suggest, a question to be resolved in the light of full discussion.

1. In the matter of the admission of Exhibit A-3, as stated in the court opinion, it was "offered by the district attorney on re-examination to corroborate the witness's [Kohler's] testimony and so admitted over repeated objections," predicated whereon the opinion adds, that, "This court has upheld the general rule that the admission of such statements for such purpose constitutes reversible error." In support of the holding, the opinion cites Colorado cases, as follows: *Connor v. People,* 18 Colo. 373, 33 Pac. 159; 25 L.R.A. 341; 36 Am. St. Rep. 295; *DePriest v. People,* 64 Colo. 358, 171 Pac. 1004; *Baker v. People,* 72 Colo. 68, 209 Pac. 791. Thus, correctly, the court stated the announced purpose of

52

the district attorney in offering the questioned exhibit, and proceeding thereon in enlightened perception of the rule clearly stated in the cases cited, which precludes such adminission, the court opinion concludes that there are "certain well recognized exceptions to the general rule," and adds, "that the present case falls within the exception and that, were it· otherwise, the rule is devoid of logical support and the foregoing authorities upholding it should be overruled." At this point the court cites *Coates v. People,* 106 Colo. 483, 106 P. (2d) 354, as an example of an exception. Factually, as is evident, the case is wholly different. There the attorney for the defense, proceeding on the premise that the witness had told a story to the police that was inconsistent with, and in contradiction of, his testimony on the witness stand, demanded of the prosecution that it produce the written statement made to the police, with which there was compliance. Armed therewith, defendant's counsel cross-examined the witness exhaustively on the inconsistencies which he, contending with the witness, urged appeared between the writing and his testimony on the stand. Disposing of the point involved there, we said, "Having dragged the statement before the court and paraded it before the jury, and intimated inconsistency, counsel waived the right to object to its introduction." Contrasting the situation there with the one here, where the district attorney was permitted to employ, for corroborating purposes, the written statement of the witness made when he was in the toils of the law pursuant to arrest on a joint charge against him and plaintiff in error involving the larceny of cattle, and whose connection therewith was of such character that unless he was able to cast the burden on plaintiff in error he was defenseless, the inapplicability of the cited case becomes clear. Indeed, in the opinion in the Coates case we were at pains to distinguish the pronouncement therein from the doctrine of the Connor case, a doctrine consistently followed in our deci-

sions since the early day of the promulgation thereof. The court opinion cites no other cases of "exceptions" to the rule, and, clearly, in the circumstances here, procedural justice does not admit of exceptions. Preliminarily to further discussion of the point, I review the record in relation thereto.

While Kohler was under cross-examination by defendant's counsel, he was asked the following question: "Why were you conferring with Mr. Sheldon, you and your father and your attorney, why were you conferring with Mr. Shelden who was prosecuting you for stealing his cattle?" To which Kohler responded: "A. I never stole them cattle. And I came up here, the sheriff never came after me, I came up here of my own accord and made a written statement here to the officers, and signed it, of the whole transaction, of the deal at that time; there was no one came after me, or anything. I didn't steal them cattle; I came up and told them about the deal, and I made a written statement." As is evident, Kohler's reference to a "written statement" not only was not responsive to the cross-examiner's question, but there is nothing in the record to indicate that in relation thereto counsel did other than ignore it. On redirect examination by the district attorney, the record reads as follows: "Mr. Mabry: Q. You stated on cross-examination that you came to Springfield, and made and signed a written statement, Mr. Kohler, is that correct? A. Yes, sir. Q. February 7, 1939? A. Yes, sir. Q. You haven't read that statement before this trial, have you? A. No, sir; I haven't seen it. Q. Did you say the same thing in this statement, — I am referring to People's Exhibit A-3, — as you are saying now? Mr. Hillyer: Just a minute—Mr. Mabry: You asked about it. You went into it. Mr. Hillyer: I object to the District Attorney making statements like that, 'you asked for it.' That is not the fact; I did not ask for it; he volunteered that statement. The Court: Well, the jury will be instructed to disregard the remarks of both

·counsel in reference to this. Is there any tender of this? Mr. Mabry: I now tender it to counsel; let him read it, and see if it isn't the same story that has been told here. Mr. Hillyer: I object to that statement. * * * Mr. Mabry: Now, I tender —, People's Exhibit A-3, — I would like to ask the witness — Q. You have seen that statement, that written statement you made and signed? A. I haven't looked at it. Mr. Hillyer: I object to any statement concerning the matter until I get my objection in. I object to any introduction of that statement, or any comment or examination based on it. The Court: Yes. Mr. Mabry: All right. I hand you People's Exhibit A-3: Will you examine that, and see if that is the written statement that you referred to as having made and signed when you first came to Springfield, when this question came up? A. Yes, sir; it is. Q. And that is the same statement you say you haven't seen since? A. No, sir; until this morning. Q. Since February, 1939, is that the correct date? A. Yes, sir; it is. Mr. Mabry: (Addressing counsel for defendant). You may examine it. Mr. Hillyer: I object to it, because it is immaterial, irrelevant and incompetent. Mr. Mabry: We are trying to get at the facts. We now offer it in evidence, People's Exhibit A-3. That was brought out on cross-examination, and not on direct. I offer it to show that he is telling the same story now, as he did in 1939. Mr. Hillyer: Part of the statement is entirely a mis-statement. In the first place, I didn't make any reference to it, because I didn't know anything about it. It is immaterial, irrelevant and improper. It is just an attempt to bolster up, and support the testimony of the witness. The witness is here on the stand, and has testified. Mr. Mabry: If it is an attempt to bolster up, your Honor, I am perfectly willing to let the jury be the judge and the Court, of what is in that exhibit which was written and signed. Mr. Hillyer: Just a minute, I object to that — The Court: The Court don't want any argument with respect to the issues, or with

reference to what the exhibit proves or disproves. The question is, whether as a matter of law it is admissible; we don't want any other question, no other question should be discussed, except the legal proposition whether it is admissible or not. Mr. Mabry: We offer that exhibit in evidence, your Honor, on the ground that it was referred to in cross-examination, not in direct. It identifies, and has been identified by this witness as the statement that he referred to in his cross-examination, under the cross-examination by defendant's counsel. It simply goes to the credibility of his testimony direct, which has been attacked; and on that ground, we offer it in evidence. Mr. Hillyer: I want to take exceptions to the continued statement of counsel, it was brought under cross-examination, because it isn't true. I want to take exception also to counsel's reiteration,—In his continued argument on the legality of this exhibit, he refers to its contents, which is an effort on his part, deliberately to prejudice the rights of the defendant, by the reference to the nature of the paper, which we contend is not admissible. I think the conduct is reprehensible from a prosecuting officer, to continue to do that, and I want the record to show my objection to it. Mr. Mabry: Your Honor will recall, there was no mention made of it in the direct-examination. Mr. Hillyer: There was no mention made by me. Mr. Mabry: You were trying to attack the witness' credibility, and that is the ground. The Court: Well, let's don't argue the matter. We will rule on this at the convening of Court this afternoon. The Court wants to refresh its recollection as to the official record, as to the inception of the question on this particular subject. * * * The Court: As to People's exhibit A-3, tendered by the prosecution in this case before the lunch hour, the Court listened to the arguments of counsel, and took the matter under advisement, and the Court is now advised in the premises sufficiently to determine the matter. The tender to intro-

duce People's Exhibit A-3 is granted. The objection is overruled, and exception allowed. It may be read to the jury." The exhibit was read to the jury.

I have set forth the foregoing record at length because it shows, conclusively, that over continued and consistent objections by defense counsel that the exhibit was hearsay and incompetent to corroborate the witness Kohler's testimony, the district attorney offered, and the Court admitted, it to serve that very purpose. We have held repeatedly that such testimony is hearsay and that it is reversible error to admit it, because, while it is incompetent, the jury may, and probably will accept it as corroboration of the witness' testimony. Of the contents of Exhibit A-3, it is sufficient to say that it is what the district attorney said it was, an earlier statement by the witness consistent with his testimony on the stand. In *Baker v. People,* 72 Colo. 68, 209 Pac. 791, we said: "The weight of authority is in support of the view that a witness cannot be sustained by proof of prior statements consistent with his evidence given on the witness stand. 40 Cyc. 2761. This rule has been established in this state by the decision in *Connor v. People,* 18 Colo. 373, 33 Pac. 159, 25 L.R.A. 341, 36 Am. St. Rep. 295, followed in *DePriest v. People,* 64 Colo. 358, 171 Pac. 1004." The persistent manner in which the district attorney proceeded in the matter of his offer of the exhibit, his constant reference to its contents and his challenge to defendant's counsel to point out in what particular that statement and the witness' testimony were at variance, all as he was laboring with the court for its introduction, emphasized the error. The philosophy of the rule is expounded, and the cases are reviewed, in *Commonwealth v. Tucker,* 189 Mass. 457, 76 N.E. 127, 7 L.R.A. (N.S.) 1056. Never, so far as my research, not sparingly indulged, has made me familiar with the authorities, and equipped me to grasp and understand the rule invoked by plaintiff in error here, has the written statement of

one defendant in a prosecution against two defendants, made after arrest and while in custody, been admitted in corroboration of his testimony made at the trial against the other defendant. In none of the books is there hint that corroboration may come from such source. The authorities upon which the Attorney General relies, and the exhaustive list cited by counsel for plaintiff in error, all are in accord and to the effect I have stated. The Attorney General calls attention to *Fuller v. State,* 197 Ga. 714, 30 S. E. (2d) 608, said by that distinguished legal representative of the people, to be "the latest pronouncements" on the rule, and quotes from the opinion there—some words of which I italicize —as follows: "If an attempt be made to discredit a witness on the ground that his testimony is given under the influence of some motive prompting him to make a false or colored statement, he may be allowed to show in reply that *he made similar declarations at a time when the motive imputed to him did not exist.*" This statement in the Fuller case was quoted from *Sweeney v. Sweeney,* 121 Ga. 293, 48 S.E. 948. The Attorney General then quotes as follows from *People v. Edwards,* 282 N. Y. 413, 23 N. E. (2d) 957 (which is a quotation from *Ferris v. Sterling,* 214 N. Y. 249), some words of which I underline: "The rule is that where the testimony of a witness is assailed as a recent fabrication, it *may be confirmed by proof of declarations of the same tenor before the motive to falsify existed.*" The Attorney General also quotes from *Sutton v. State,* 155 Tenn. 200, 291 S. W. 1069, as follows, a portion of which I emphasize: "While the general rule is that witnesses cannot be corroborated by proof of previous consistent statements, where a witness has been assailed on the ground that his story is a recent fabrication, or where he has some apparent motive for testifying falsely, under well-recognized exceptions *proof that he gave a similar account of the transaction when the motive did not exist, and before the effect of such an account could*

*be foreseen, is admissible."* Before Kohler gave the statement evidenced by Exhibit A-3, complaint had been made before a justice of the peace charging him and plaintiff in error with larceny of the two cattle involved in the alleged theft, and he had been apprehended by Oklahoma peace officers. He, not plaintiff in error, had sold the cattle to an Oklahoman and collected the sale price, sixty dollars, or only two thirds of the value alleged in the information and found by the jury. The low price he accepted for the cattle and his every act connected with their sale, so enmeshed Kohler in the transaction that only by a story involving another in the manner of Exhibit A-3, could he hope to escape. Not only the facts of that transaction, but the fact that just previously he had been informed against in the same court on another cattle stealing charge, presently to be followed by four other separate charges, as already related, made contribution to his interest in "sticking" to his story narrated in Exhibit A-3. That he is not truthful, not to be expected in any event, the circumstances considered, unquestionably appears from his testimony that he had not seen Exhibit A-3 since he signed it in February, 1939, when on the face of the exhibit it appears that he re-signed and swore to it in December, 1939, before the clerk of the district court. By nothing said in this dissent do I mean to imply that Kohler was not competent to testify, for, regardless of the inconsistencies attending his testimony, the obvious contradictions apparent throughout his story, and the undeniable self-interest obtaining, his competency was not, nor successfully could it have been, questioned. That the jury would have believed the story Kohler related on the stand, born as it was out of the necessities of his own perilous situation, and shot through with the apparent improbabilities attending, while within its province, was unlikely. A jury did not believe it at an earlier trial, and the weakness of the people's case against plaintiff in error at the second trial, not un-

perceived by the astute prosecutor, was woefully in need of corroboration. In the extremities of the situation, if, for an illustration, I may venture into a field of learning strange to judges, the district attorney played a "fifth ace," which, as I have been informed, is not permissible. Thus the trial court, allowing the play, went counter to the authorities in general, and of our own in particular, a proposition recognized and formally expressed in the court opinion here. Why the error, grievous in the extreme, should enjoy the approval of a bench of reviewing ministers, will never cease to mystify students and lovers of justice.

But, as stated in the court opinion, "The ruling, now so vigorously contested, was not called to the attention of the lower court by defendant's motion for a new trial. The holding in this jurisdiction is that alleged errors not so presented will not be considered here." The cases cited in the court opinion in support of the pronouncement I have just quoted, are *Dockerty v. People*, 96 Colo. 338, 44 P. (2d) 1013, and *Eachus v. People*, 77 Colo. 445, 236 Pac. 1009. In the Dockerty case the reference is to a motion in arrest and a supplemental motion for new trial, disregarded because filed after expiration of the term at which final judgment had been entered. I cannot think it is a point. In the Eachus case, the language of the court, some words of which I italicize, is, that, "A number of defendant's assignments of error cannot be reviewed here because they relate to matters which were not raised in the motion for new trial, *nor in any manner brought to the attention of the trial court*." How different is the record here. Many pages of the record, already set forth, pertain to the point under discussion, during which there was full revelation, concerning which the trial court, when ruling thereon, was fully advised as to defendant's contention. Rarely, if ever, has the record of a case afforded the trial court such full opportunity to give attention to a controlling point, determination of which

was made after the court had taken a recess for the purpose of study. In the circumstances, as I conceive, the precedents are to the effect that so palpable an error as the trial court's ruling on the admission of Exhibit A-3, should be examined notwithstanding oversight of counsel in omitting it from the motion for new trial. *Leech v. People,* 112 Colo. 120, 146 P. (2d) 346; *Paine v. People,* 106 Colo. 258, 103 P. (2d) 686; *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71.

The fact that employed counsel of plaintiff in error, the late Honorable Granby Hillyer, did not recall "everything" as he proceeded in the preparation of the motion for new trial, and evidently forgot to include the matter of the admission of Exhibit A-3, concerning which the record is replete with his objections thereto, should not, I think, operate to close our eyes to the manfiest error attending the court's ruling on the point. To the general knowledge of all his acquaintances, and to the particular knowledge of the trial court and its officers, and to the members of this court, Judge Hillyer, in his strength one of Colorado's most competent trial lawyers, then was in physical and mental decline. He could not speak above a hoarse whisper, a handicap that necessarily deprived him of his well earned and recognized power of advocacy, as well as of foiling and parrying qualities, in which in health he excelled. It was in recognition of the foregoing, and of the importance of the case, that the trial court, proceeding only a few days before the trial, appointed Donald T. Horn, Esquire, of the Lamar Bar, to aid Judge Hillyer. Mr. Horn neither did, nor was he expected to, prepare the defense or be responsible other than to act in aid of plaintiff in error's employed counsel in the court room. Judge Hillyer, who had tried the case at an earlier time —and which resulted in a mistrial, the jury not agreeing —made considerable use of Mr. Horn's vocal qualities in the course of the trial, a role modestly accepted by Mr. Horn. Judge Hillyer, residing in Denver, prepared

the motion for new trial, and in his weakened condition evidently he forgot that which in his strength would have been as second nature, namely, to set forth in the motion for new trial the objection which in the course of the trial he had urged to the admission of Exhibit A-3, as already stated at length. Instead of consulting Mr. Horn, living at Lamar, about the motion for new trial and what it should contain, a failure that the court opinion would visit upon plaintiff in error, Judge Hillyer prepared the motion himself, signed it as sole counsel for his client, and mailed it direct to the clerk of the district court, at Springfield. Fairly, as I conceive, the failure to consult Mr. Horn in the premises was but further manifestation of Judge Hillyer's impaired health and faculties. Justice demands that we examine the point, and our pronouncements, cited in the court opinion, and to which I have adverted herein, support our authority to do so. Soon after the motion for new trial had been denied, it is informing to say, Judge Hillyer succumbed to the malady which long before had sapped him of all his powers save that of spirit. It should be added that Mr. Ham, appearing for plaintiff in error, was not engaged until after all proceedings in the district court had been concluded.

2. The prejudice of jurors. The court opinion is restrained in its exposition of the facts, but even there, juror White is quoted as saying to other jurors "that defendant is no good," and "that he held, or had held two of his short checks." Juror Glasgow, testifying in the matter, stated that he heard other jurors talking about what White had said relative to defendant's short checks, and "out of curiosity" he asked "White about those checks," and he answered that "he had two hot checks on Welch, and I supposed he did have." Juror Barnes testified that he heard the jurors talking about the "worthless checks that Roy might have given," and on inquiry of him, "Frank White told me, just the words he used, 'He is no good, I have got two bad checks on

him. He is no good'." When Barnes was asked what further White had said about the matter, he answered: "He said he thought Welch was guilty, and I told Frank White, I said 'you are wrong. You should not hold that against Roy Welch.' I felt that * * * just because Roy Welch had given him two bad checks, should not have anything to do with this case, and that is just what I told Frank White." In response to Barnes' last suggestion, White "did not say anything."

The record further shows that White and three other jurors talked much of the "short checks" incident, all proceeding on the theory that there were such checks, and that Welch had issued them. In the course of this prejudicial conversation, another juror, Nevelles, said he had a short check that Welch gave him. The record considered, it is consistent to conclude that the jury must have given as much attention, if not more, to White's assertion that he held Welch's short checks, and other jurors' like contributions of their mistaken beliefs, than to the facts of the larceny charge on which he was being prosecuted. It is to be borne in mind that while the jurors were discussing short checks, it was believed by them that the checks in question had been given by defendant, whereas, in truth, as the jurors learned subsequent to their verdict, and freely testified on the motion for new trial, the checks were not defendant's. Juror White explained his error by saying that his wife told him that Welch gave the checks they held, and since he himself had not seen the man who had given the checks, he supposed the defendant was the one to whom his wife had referred. Thus fortified, White, proceeding on the erroneous premise appearing, and unmindful of his duty to consider only the evidence in relation to the charge of larceny against defendant, said to other jurors that which not only was calculated to prejudice them, but to fortify himself in his declared conviction that the "defendant is no good." The fact that White dwelt upon the check matter with other

jurors in the persistent manner appearing, is proof positive of two things, first, that he was prejudiced, and, second, that he labored to impress his unfairly predicated views upon his fellow jurors. In such situation, Who is competent to say, "as a matter of law," which is the rule—presently to be shown—that White was an impartial juror, or that his effort to influence other jurors was void of effect? Every rule of reason and logic indicates, that, regardless of the evidence in the larceny case, White wished to have defendant convicted and predetermined to cast his vote to that end. Not only so, but he actively did what he could to induce other jurors to share his feelings against defendant. In lesser degree, as clearly appears, other jurors, wholly mistaken, as was White, as to the identity of the issuer of the short checks, as subsequently they acknowledged, contributed to the creation of an atmosphere grossly unfair to the man on trial.

In considering this question, recourse may be had to the well known procedural rule to the effect that it is not permissible for the prosecutor to introduce evidence of offenses other than the one charged. Suppose that here the district attorney had sought to introduce evidence of the short checks incidents, Is it supposable that the court would have permitted it? No. But assuming the contrary, it would not have been fraught with the insidious implications of the record here, and, besides, defendant could have shown (as the fact was) that he was not the individual who gave the questionable checks. In the state of the record, White the juror, in secret retirement with his fellows, some of whom contributed thereto, and without the knowledge of defendant or his counsel, unknown to the district attorney, and, of course, without the permission of the court, was urging upon the attention of his fellows that which the district attorney no less than defendant's counsel, having knowledge thereof, would have denounced at once.

It is recited in the court opinion that "the jurors involved testified that this 'short check' talk did not influence their verdict. Such evidence was incompetent." Quite right, as all will agree. The rule is well stated in *McLean v. People,* 66 Colo. 486, 180 Pac. 676, and quoted with approval in *McPhee v. People,* 108 Colo. 530, 120 P. (2d) 814, part of which I emphasize, reads as follows: "It is well settled that jurors may testify to any fact showing the existence of an outside influence, *but they cannot give evidence as to the effect any such outside influence may have had upon their minds in arriving at a verdict.* Courts never enter into such fields of conjecture. What they do is to hear the facts and determine *as a matter of law* the effect reasonably calculated to be produced upon the mind of the juror by such outside influences."

The issue is not met, as I conceive, by the suggestion in the court opinion that for housing purposes the jurors were grouped and lodged in separate hotels, and that juror White confined his efforts to those with whom he was lodged. In the performance of their duty jurors act as an entirety, not in groups, and since to be effective all must agree, a group of the jurors, however small, or even one juror, of the panel chosen to try the case, guilty of the misconduct concededly appearing here, appraised by any measure of justice, should void the verdict returned. It is the fact of the "bad apple" in the barrel, not the place therein, that works destruction of the entire contents. That the two checks White discussed were old and small, does not make his conduct less baneful. Besides, it was not until after the verdict, and then in an open court inquiry, that he disclosed the size and dates of the checks he told other jurors he held. When "working" on his fellow jurors, his story was of "two short checks," nothing as to dates or amounts, perforce Welch was "no good." It should be noted, too, that in answer to Welch's motion for new trial, White made an affidavit in which he swore he did not discuss "short

checks" or otherwise speak evil of defendant to his fellow jurors. On examination before the court, however, testifying in the presence of the other jurors, he admitted to the contrary. In short, White was an unreliable and untruthful juror, who, working secretly with jurors of his group, did what he could to injure defendant's standing generally, and to cause his conviction. Some other jurors, not to be wholly outdone by their fellow White, made considerable contribution to the untrue and damaging stories about Welch. There is not justification for the assumption set out in the opinion, "that this loose jury talk was considered by the court as too trivial to have deafened any juror to his oath or colored his verdict. In so holding no abuse of discretion appears." The talk was not "trivial," nor did the trial court say it was, and the term "loose," too, is of creation here, not of a finding below. What the trial court did—and it is stated in the court opinion that it was erroneous—was to admit evidence as to whether stories unrelated to the crime charged, already detailed, which quite generally were circulated among a considerable number of jurors, if not all of them, "influenced their verdict." I do not subscribe to the implication that the court received the evidence in sheer idleness. The court must have considered it competent, and since in disposing of the motion for new trial it entered an unexplained denial, justification does not attend the thought expressed in the opinion that the court disregarded such evidence.

Considering the prejudicial attitude of juror White, and some of his fellows, less voluble, their voluntary and secret communications of nonpertinent and noncompetent, but most damaging, accusations against defendant to their fellow jurors—brought to light after the event—a verdict of guilty, plus the further challenging fact that they were wholly mistaken in all they said or implied, I submit that denial of defendant's motion for new trial was shockingly wrong. A man on

trial for his liberty, a well-known procedural rule observed, is entitled to be confronted by those who testify against him, and the rule may not be varied because some who were of the jury chosen to resolve the facts, proceeding sans oath, and in secret, bore false witness in manner here. I am convinced that defendant did not have a fair trial, and only as to that am I concerned.

Mr. Chief Justice Knous concurs in this dissenting opinion, and Mr. Justice Stone, who limits his consideration to the admission of Exhibit A-3, also concurs.

### On Petition for Rehearing.

Mr. Justice Hilliard.

In further support of my firm conviction that plaintiff in error was not accorded a fair trial, already stated at some length in my dissenting opinion, in which two other justices concurred in whole or in part, I now set forth his petition for rehearing filed by counsel, which is as follows:

### "Petition for Rehearing"

"The Plaintiff in error, by his attorney, Wilkie Ham, prays the Court for a rehearing, and as grounds respectfully suggests:

"1. The Court, in the majority opinion, page 6, stated: 'That Mr. Hillyer was suffering from a most annoying and troublesome affliction is beyond question. *But that this went further than an impediment in his speech does not appear from the record.*'

"The above statement was made in connection with the Court's discussion of the admissibility of * * * exhibit A-3, and his failure to include it in the motion for new trial.

"I respectfully submit that the Court misapprehends the fact as to Mr. Hillyer's physical condition and the state of his health at the time the motion for new trial

was prepared. Mr. Hillyer stated in his affidavit for new trial (Abstract 126, folios 820-22): 'That the affiant [Mr. Hillyer] had been ill ever since the termination of the trial, and that the preparation of the motion for a new trial had been done under extreme difficulties and handicaps, because of affiant's critical physical condition.'

"It is certain that the loss of voice conceded by the Court in the majority opinion would have nothing to do with Mr. Hillyer's ability to prepare a motion for new trial. The Court, in the majority opinion page 6, states: 'If the failure here apparent [that is, the failure to mention in the motion for new trial the erroneous reception in evidence of exhibit A-3] could reasonably be ascribed to counsel's affliction that position would certainly merit our most careful consideration.'

"The Court, in the majority opinion, then states: 'But that it can be so ascribed, we are unable to assume from the record before us and from the facts of which this Court should take judicial notice.'

"From this statement of the Court, it is apparent that the Court would take Mr. Hillyer's physical condition into consideration, but considered he had only a loss of voice. This is evident by what the Court said, page 6 of the opinion. 'This affliction had been of long standing * * * and was patent to everyone when he more than once appeared in this Court in other causes.'

"Surely Mr. Hillyer did not appear before the Supreme Court 'ill and under extreme difficulties and handicaps because of affiant's critical condition.' It is clear that the Court in its opinion has misapprehended the undisputed fact of record as stated in the motion for new trial, that Mr. Hillyer's condition (not his voice) was that he had been *ill* ever since the termination of the trial, and that the preparation of the motion for new trial had been done under extreme difficulties and handicaps because of 'Affiant's critical physical condition.' It is difficult to imagine a stronger statement

of illness that handicapped the preparation of a motion for new trial.

"2. The Court, on page 2, of the majority opinion, states that the record 'discloses many conflicts in the testimony and doubtless much perjury. *Where truth and where falsehood lie is not for our resolution.* The verdict testifies to the credence given by the jurors to that which supports it and permissible inferences deducible therefrom.'

"I respectfully submit that, in such a situation, it is the function of the reviewing Court to be especially watchful that no error occurred in the trial of the case. Where the evidence is one-sided, clearly preponderant and there are not any conflicts in testimony, in such a case error might be harmless. But in a case such as the Court describes the case at bar, any error might cause a miscarriage of justice. The case at bar is replete with errors, prejudicial to the plaintiff in error, and especially where as here there is a serious conflict of testimony.

"3. The Court, in the majority opinion, page 3, with reference to the fact that one of the jurors had stated that the defendant was 'no good,' and that he had bad checks on him, states: 'Many authorities hold it improper to admit evidence in impeachment of a verdict that extraneous considerations influenced concurrence therein, but even this rule has its well recognized exceptions. *Wharton v. People,* 104 Colo. 260.'

"I submit that the Court has misapprehended the law as announced in the case of *Wharton v. People.* This case holds that affidavits may be submitted by the jurors for consideration of the trial Court in the determination of the trial Court as to whether or not the defendant had had a fair trial, but the case of *Wharton v. People* nowhere states that a juryman, under any circumstances, may state that his verdict was influenced by extraneous considerations.

"The Court in the majority opinion states that the Court's attention has not been called to any case wherein it was held reversible error to admit the statement of a juror that extraneous matter did *not* influence his verdict. The Attorney General has not raised this point, and plaintiff in error has not been called upon to furnish a brief on that point, but I feel confident that there is plenty of legal authority that it is reversible error for a juryman to testify that his verdict was not influenced by any particular matter. There is certainly plenty of authority to the effect that he cannot say that his verdict was influenced by a particular matter, and, if a motion for a rehearing is granted in this case, I am confident that plenty of authority can be produced.

"The Court, in the majority opinion, further states: 'Such testimony amounts to nothing more than the juror's assertion that he kept his oath and in the absence thereof all presumptions are that he did so.'

"The law, as announced by the Court, makes the rule set forth in *Wharton v. People,* 104 Colo. 260, of no effect, if the juryman states that his verdict was not influenced by those extraneous matters, and it means that, regardless of the nature of the prejudicial matter coming before the jury, if the juryman states that his verdict was not influenced by this matter, that would dispose of any contention that the juror might have been influenced by this matter.

"It is respectfully submitted that a juryman may not properly state that his verdict was influenced, and he also may not properly state that his verdict was *not* influenced.

"The statement of the Court from the case of *Garden City Feeder Company v. Comm'r of Internal Rev.,* 75 Fed. (2d) 804, is a rule announced in the Colorado cases of *Brown v. Estate of Roche,* 87 Colo. 432, at page 435, and *Church v. Ice Cream Co.,* 89 Colo. 390, at page 392. This is the general rule, but, notwithstanding that rule,

it is consistently held by the Courts that a juror may not impeach his verdict or sustain his verdict by his statements to the effect that certain things did or did not influence his verdict.

"If the rule citing *Garden City Feeder Company v. Comm'r of Internal Rev.*, 75 Fed. (2d) 804, and the rule announced in the two Colorado cases just cited shall have reference to the effect of evidence taken in the trial by Court and is applied with respect to hearings on the deliberations of a jury, then there would never be any occasion for the rule that a juror cannot impeach or sustain his verdict by *stating* that certain matters *did or did not* influence him, because these hearings are always to the Court, and my research has never disclosed a statement of any authority that it was immaterial whether the juryman stated in the hearing before the Court that he was or was not influenced by certain matters.

"4. The Court in the majority opinion states, in effect, that, in order for a defendant in a criminal case to have consideration of an error committed in the trial, he must present it in his motion for new trial. This is a rule adopted by the Supreme Court to cover civil cases, and I respectfully submit that it was not the law in Colorado prior to the announcement herein, and that it creates a very severe burden on defendants in criminal prosecutions who frequently have scant funds to have a bill of exceptions prepared before the motion for new trial is filed. And I further respectfully submit that the authorities cited by the Court on page 5 of the opinion do not support the rule as announced by the Court in its opinion.

"The rule as announced leaves the practitioner in the position of being unable to tell under what circumstances the Court will apply the rules laid down in *Reppin v. People*, 95 Colo. 192; *Stowell v. People*, 106 Colo. 258; and other cases. Since the practitioner will be unable to determine when the reviewing Court will

or will not consider an error of the lower Court, no matter how vigorously and extensively the error was brought to the attention of the trial Court, if it is not mentioned in the motion for new trial.

"5. The plaintiff in error was granted in the first rehearing an opportunity for oral argument. When the second rehearing was granted, plaintiff in error in his answer brief requested oral argument. The plaintiff in error is not aware of the reason that oral argument was not permitted on the second rehearing. Various points have been raised by both attorneys for the defendants in error and plaintiff in error, and, in the opinion of the attorney for the plaintiff in error, warranted a discussion before the Supreme Court."

I think the petition should be granted. In addition to the fact that I regard the contentions therein incorporated legally sound and logically compelling, I commend the document as a model. Not only is it becomingly respectful and dispassionate throughout, but is well colculated, as I believe, to move reviewing ministers of justice to give pause ere they voice final denial of an unfortunate man's plea for a trial to be conducted in conformity with procedural rules conceived in the interest of the public and of those charged with crime.